**Mark H. SABREE, Plaintiff, Appellant,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS LOCAL NO. 33, Defendants, Appellees.**

**No. 90–1521.**

United States Court of Appeals, First Circuit.

Heard Nov. 8, 1990.

Decided Dec. 27, 1990.

Paul A. Manoff, Boston, Mass., for plaintiff, appellant.

Aaron D. Krakow with whom Feinberg, Charnas & Schwartz, P.C., Boston, Mass. was on brief, for defendants, appellees.

Before BREYER, Chief Judge,
SELYA, Circuit Judge, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Mass.G.L. c. 151B § 5 wherein plaintiff-appellant, Mark H. Sabree, a black man, alleges that he was discriminated against on account of his race by defendant-appellee, the United Brotherhood of Carpenters and Joiners of America Local Number 33 ("Local 33"). The United States District Court for the District of Massachusetts granted Local 33's motion for summary judgment on the grounds that all of the claimed violations, save one, were time barred under the statutes, that there was no continuing violation that would operate to save the "stale" claims and that appellant had failed to present a prima facie case for disparate treatment as to the one violation that was not time barred. Sabree appeals from this ruling. For the foregoing reasons, we affirm the District Court's ruling that the earlier claims are time barred; however, we vacate the grant of summary judgment as to the timely claim and remand the case.

## I. BACKGROUND

Sabree, a Boston resident, first applied for membership in Local 33 as an apprentice in the fall of 1970. Local 33 is one of four unions that comprise the Boston District Council.[1] At that time, he was told to

---

* Of the District of Rhode Island, sitting by designation.

1. The Boston District Council of Carpenters consists of Locals No. 33, 40, 67 and 218. The Council is governed by a Constitution and By-Laws that set forth the rules governing the relationship among the locals. According to these rules, each local has a particular geographical

come back in a couple of weeks. Upon his return, he was told that the Local was out of applications and that he should come back in the spring. When Sabree reappeared in the spring of 1971, he was told that applications were only given out in the fall. When Sabree reappeared in the fall of 1971 he was told that he was too late and that all apprentice classes were full. In the spring of 1972, Sabree again attempted to apply and was again told that applications were only accepted in the fall. Despite Sabree's numerous contacts with Local 33 during this time period, it appears that he was never told that the defendant actually accepted applications every February.

In 1977, Sabree, having been unsuccessful in his attempts to become an apprentice with Local 33, joined and became an apprentice in Local 107 (a Worcester-based local that was not a member of the Boston District Council). Once more, in 1978, plaintiff contacted Local 33; this time he applied to transfer into Local 33 from Local 107. This attempt to transfer led to Sabree's second set of encounters with Local 33. At first, he was told that he could not transfer because he was an apprentice. In 1979 when plaintiff renewed his attempt to transfer, he was again thwarted. This time he was not told that his apprenticeship status barred his transfer but that the local was not taking transfers because too many members were out of work. In 1981, after becoming a journeyman with Local 107, Sabree again tried to transfer to Local 33. As before, he was denied the transfer. This time the explanation was that the Local did not take transfers unless the prospective transferee first found his own union work in Boston. It was at this time

that defendant advised Sabree to instead join Local 67 or Local 40, other locals in the Boston District Council.

Frustrated and sensing the futility of his transfer attempts with Local 33, Sabree, in 1982, transferred to Local 40 in Cambridge. A year later, the business manager of Local 40, requested that Sabree leave the local and transfer back to Local 107.[2] Sabree complied; he worked for Local 107 in Worcester but continued to live in Boston.

Two years passed. During this interim, Sabree learned that the Boston District Council had a by-law that restricted intra-council transfers.[3] In 1985, Sabree relaunched his efforts to transfer into Local 30. During this third and final set of attempts, Sabree did not inform Local 33 that he had, at one time, been a member of Local 40, nor did anyone from Local 33 inquire as to the history of his union membership. As in 1981, Sabree was told, over the telephone, that no transfers were accepted unless the transferee first found his own union job. He then wrote to the defendant requesting a transfer and made numerous attempts to obtain union work in Boston. These attempts to obtain union work on his own were as futile as his attempts to join or transfer to Local 33. At the job sites he was repeatedly informed that they only hired through the union hall. On July 17, 1985, in response to Sabree's earlier letter, Local 33 explained the transfer procedure, noting that he needed authorization from the Business Agent of the local to obtain the transfer. In addition to explicating the procedure, the defendant also told Sabree that his present job was

jurisdiction. The jurisdiction of only two of these locals is relevant to the present case: Local 33's jurisdiction includes downtown Boston; Local 40's jurisdiction includes Kenmore Square, Cambridge, Brookline, and the Allston–Brighton areas of Boston. Moreover, the rules set forth standards with regard to membership transfers; this aspect of the by-laws will be discussed more fully *infra*.

2. This request followed an incident in September 1983 when Sabree indecently exposed himself to the secretaries in the Local 40 office.

3. The By–Law reads:

Any member that has been initiated or admitted by clearance card into any local affiliated with the Boston District Council, and transfers from that local into any local outside the Boston District Council, shall be required upon return to the Boston District Council to place his book in the local which he had previously been initiated or cleared into. Also, there shall be no transfers from one local to another within the Boston District Council.

non-union.[4] Sabree disagreed that with the characterization of his present job as non-union, but he did not pursue the issue any further. Instead, on July 31, 1986, plaintiff made his final attempt to transfer into Local 33. This time, he was told that the local was not taking any transfers from within the state. That same day, Sabree filed a complaint alleging racial discrimination against Local 33 with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD").

Early in 1988, Sabree filed suit in the United States District Court for the District of Massachusetts alleging a violation of Title VII and Massachusetts law. The District Court granted summary judgment for Local 33 on April 27, 1990. Sabree has appealed that order.

## II. SUMMARY JUDGMENT

Before granting a motion for summary judgment under Fed.R.Civ.P. 56, a court must find that there is "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The facts must be viewed in the light most favorable to the non-moving party. *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). We will reverse a grant of summary judgment if "there existed any factual issues that needed to be resolved before the legal issues could be decided." *Rossy v. Roche Products Inc.*, 880 F.2d 621, 624 (1st Cir.1989). Moreover, "our review will be most searching in cases, such as this, that turn upon the issue of motive or intent." *Id.; see Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 759 (9th Cir.1980) ("Courts are reluctant to dismiss by summary judgment Title VII discrimination suits where … motive and intent are crucial elements and the proof is in the hands of the alleged wrongdoers.").

In the present case, the District Court ruled that all of the alleged discriminatory incidents complained of, other than the 1986 denial of transfer, were time-barred under federal and state law. The court further held that the earlier incidents did not amount to a continuing violation. As to the timely 1986 incident, the court found that plaintiff failed to make out a prima facie case of disparate treatment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Specifically, the district court found that the by-laws cited by the defendant rendered plaintiff unqualified for membership. We agree with the district court that plaintiff's pre–1986 claims are untimely; however, because we find that the court's legal conclusions with regard to the 1986 claim are incorrect, we vacate in part the grant of summary judgment and remand the case for further proceedings in accordance with the standard set out below.

## III. STATUTE OF LIMITATIONS

"Issues of timely filing may be decided under Rule 56 if the relevant facts are sufficiently clear." *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir.1990) (citing *Doyle v. Shubs*, 905 F.2d 1, 1 (1st Cir.1990) (per curiam); *Kali Seafood, Inc. v. Howe Corp.*, 887 F.2d 7, 9 (1st Cir.1989); *Mack v. Great Atlantic & Pacific Tea Co.*, 871 F.2d 179, 191 (1st Cir.1989)). The initial requirement for a Title VII "timely filing" is that the plaintiff must file a charge of discrimination with the EEOC. *See id.* In a deferral state, such as Massachusetts, a state with its own civil rights statute and agency, Title VII, 42 U.S.C. 2000e–5(e), requires that a plaintiff file the charge with the appropriate state agency within 240 days of the discriminatory act and with the EEOC within 300 days of the act. *Mack*, 871 F.2d at 181, *Cajigas v. Banco de Ponce*, 741 F.2d 464, 467 (1st Cir.1984).[5]

Because the plaintiff did not file any charges until July 31, 1986, the only inci-

---

**4.** According to the Constitution of the United Brotherhood of Carpenters and Joiners of America, any member of the brotherhood working for a non-union contractor would be working in violation of the union's constitution.

**5.** M.G.L. Chapter 151B, Section 5 requires that complaints must be filed within six months after the discriminatory act.

dent falling within the statutory time frame is the transfer denial of the same date. Plaintiff seeks to recover for the prior allegedly discriminatory acts by arguing that they constitute a continuing violation.

> The law of continuing violations is both complicated and confusing, in part because there are a number of different theories under which the courts have found such violations to exist, in part because the discussion in many of the cases is less than clear, and in part because some of the fact situations involved in the cases, and also some of the concepts involved, pose very difficult line-drawing problems. B. Schlei and P. Grossman, Employment Discrimination Law 884 (1976).[6]

■ The present case differs factually from our previous continuing violation cases. In this Circuit we have delineated two types of continuing violations: serial violations and systemic violations.[7] *Jensen*, 912 F.2d at 522 (citing *Mack*, 871 F.2d at 183).[8] Sabree has not alleged, nor is there any evidence of, a systemic violation. We, therefore, focus our attention on the serial violation branch of the continuing violation doctrine. "Such a violation is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII." *Id.* In order for the violation to be actionable, at least one act in the series must fall within the limitations period. *Id.; Mack*, 871 F.2d at 183. This proposition goes to the heart of *United Airlines Inc. v. Evans*, the 1977 Supreme Court case holding that a discriminatory act, not merely the effects of a past discriminatory act, must occur

within the limitations period. 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1888–89, 52 L.Ed.2d 571 (1977); *see Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). Most of our earlier cases have turned on this issue: whether any act sufficient to sustain a violation occurred within the limitations period. *See Jensen*, 912 F.2d at 522–23; *Mack*, 871 F.2d at 183; *Cajigas*, 741 F.2d at 469–70; *Velazquez v. Chardon*, 736 F.2d 831, 833 (1st Cir.1984); *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018–19 (1st Cir. 1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980).

In the case at hand, there is no question that an allegedly discriminatory act occurred within the limitations period. The 1986 transfer denial by Local 33 took place on the same day that the defendant filed his charge with the EEOC and the MCAD. In a situation such as this, no continuing violation theory is really needed to support a violation as such, *see Elliott*, 79 F.R.D. at 585[9] but it is needed to determine whether the plaintiff may "reach back" and be compensated for the earlier claims.

■ To analyze Sabree's Title VII claim, it is useful to consider the violation and the remedy separately. *See* Note, *The Continuing Violation Theory of Title VII After United Air Lines, Inc.*, 31 The Hastings L.J. 929, 930 (1980); *Miller v. Miami Prefabricators, Inc.*, 438 F.Supp. 176, 178 (S.D.Fla.1977). "[T]he peculiar nature of Title VII remedies means that the continuing violation theory has real implications for the appropriate remedy even when the plaintiff can show an act of discrimination within the relevant time period and there-

---

6. Although many cases have come down since Schlei and Grossman made this statement, in particular *United Airlines Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the sentiment expressed is still accurate.

7. [A] systemic violation need not involve an identifiable, discrete act of discrimination transpiring within the limitations period. A *systemic violation* has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to

have filed a timely complaint. *Jensen*, 912 F.2d at 523 (citations omitted).

8. In *Elliott v. Sperry Rand Corp.*, 79 F.R.D. 580, 585–86 (D.Minn.1978), the court described four different continuing violation scenarios and suggested that there may be additional ones.

9. Neither is the continuing violation theory necessary for determining what evidence is admissible at trial, for even under *Evans*, past acts constitute relevant background evidence. 431 U.S. at 558, 97 S.Ct. at 1889.

fore can clearly sue over something." C. Sullivan, M. Zimmer, and R. Richards, *Employment Discrimination*, § 11.5 at 452 (1988). The issue in the case before us then becomes not whether there is an act sufficient to support a violation that occurred within the limitations period, but whether the acts outside of the limitations period may be relied upon in awarding a remedy, such as back pay.

This Circuit has not yet ruled on the issue of whether it is proper to reach back to discriminatory acts outside the limitations period. *See Cajigas*, 741 F.2d at 470. Other courts, however, have ruled that "[o]nce having shown discrimination continuing into the actionable period ... the plaintiffs may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period." *McKenzie v. Sawyer*, 684 F.2d 62, 72 (D.C. Cir.1982); *see Roberts v. Gadsden Memorial Hospital*, 850 F.2d 1549, 1550 (11th Cir. 1988); *Berry v. Board of Supervisors of LSU*, 715 F.2d 971, 980 (5th Cir.1983), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986); *Anderson v. U.S. Steel Corp.*, 18 F.E.P. Cases (BNA) 652, 653 (N.D.Cal.1978); *see also EEOC v. North Hills Passavant Hospital*, 455 F.Supp. 335, 337–38 (W.D.Pa.1978) ("As to *remedies* available for individuals who did suffer timely injuries ... the limitation period does not apply."). This proposition is buttressed by the provisions of Title VII itself. Section 2000e–5(g) states that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission [EEOC]." By allowing for the possibility of recovering back pay for over a year prior to the 300 day filing period, "Congress must have envisioned continuing remediable violations that existed prior to the running of the period." C. Sullivan, M. Zimmer, and R. Richards, *supra*, § 11.5 at 452. If, in fashioning a remedy, a court could not reach

back beyond the 300 day filing period, the two-year back pay limitation would be meaningless.[10] We also note the importance of fashioning make-whole relief under Title VII. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420–21, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975). "The objective of fashioning an appropriate remedy in Title VII cases is to formulate the most complete relief possible to eliminate the effects of discrimination." *North Hills*, 455 F.Supp. at 338 (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, [364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396] (1977); *Albemarle*, 422 U.S. at 421, 95 S.Ct. at 2373.) We are persuaded by these considerations that in the appropriate circumstances, backpay may be based on acts that occurred prior to the limitations period when a violation has been established by an act within the period. "The reasoning behind this theory is that the individual acts are simply incidents of a continuing discriminatory practice for which the defendant has [already] been found liable...." Note, *supra*, at 931.

We are mindful, however, of the important policy behind the limitations period. "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Ricks*, 449 U.S. at 256–57, 101 S.Ct. at 503–04. "This Court has respected Title VII's temporal strictures," *Jensen*, 912 F.2d at 521, and will not allow this theory to resurrect an otherwise dead claim. We believe that before a plaintiff can reach back and recover for a series of acts outside the limitations period, he must first prove a substantial relationship between the acts. *See Berry*, 715 F.2d at 981.[11] Without a substantial relationship between the timely and the untimely claims, they cannot be viewed as a continuing violation. This does not un-

---

**10.** "[I]f only acts less than [300] days old are compensable through backpay (a proposition implicit in any argument that denies the continuing violation notion), there could never be any possibility of obtaining backpay for discriminatory acts between [300 days] and two

years." C. Sullivan, M. Zimmer, and R. Richards, *supra*, § 11.5 at 453.

**11.** Title VII claims will, of course, always be bound by the two year limitation of Section 2000e–5(g).

dercut the policy behind the limitations period because adding the prior claims does not substantially change the burden the employer would face in defending only the timely filed claim. The prior acts would be relevant as evidence with regard to the timely claim, *Evans,* 431 U.S. at 558, 97 S.Ct. at 1889, and would thus have to be addressed by the employer one way or the other.

▮▮▮ How then do we determine whether a substantial relationship exists to justify an expanded remedy? The Fifth Circuit has suggested a number of factors, including whether "the act [has] the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights." *Berry,* 715 F.2d at 981. We consider this factor, permanence, the most important of those outlined by the Fifth Circuit.[12] *See Roberts,* 850 F.2d at 1550; *Berry,* 715 F.2d at 981. Permanence is basically an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act. "What matters is whether, when and to what extent the plaintiff was on inquiry notice." *Jensen,* 912 F.2d at 522 (citing *Olson v. Mobil Oil Corp.,* 904 F.2d 198, 203 (4th Cir.1990)). "A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the [300] day limitation period." *Roberts,* 850 F.2d at 1550. It is this factor that is the undoing of Sabree, for he has admitted that he believed, at every turn, that he was being discriminated against. A knowing plaintiff has an obligation to file promptly or lose his claim. This can be distinguished from a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern. *See Cajigas,* 741 F.2d at 470. After all, "[e]mployers as well as employees are entitled to procedural safeguards in the precincts patrolled by Title VII." *Jensen,* 912 F.2d at 522. Having found that Sabree failed to

satisfy the most important factor, we hold that there is no substantial relationship between the transfers; therefore, Sabree's 1986 transfer attempt must be treated as a discrete act. Any relief granted on remand should be fashioned accordingly.

## IV. DISCRIMINATION CLAIM

Having determined that Sabree's 1986 claim of discrimination is the only claim not time barred, we turn to the merits of the case. The District Court held that a Boston District Council by-law rendered Sabree unqualified and that he therefore failed to establish a prima facie case of discrimination. The by-law states that once a carpenter joins one of the locals within the Council, he may not transfer to any other local within the Council. See *supra* note 3. In 1986, when Sabree made his final attempt to transfer into the defendant local, the by-law was not mentioned. In fact, the by-law could not have been the reason for the denial because the local did not even know that Sabree had previously been a member of a council local, Local 40, until discovery.

Sabree's claim of alleged discrimination is one of disparate treatment. In a disparate treatment case, "proof of discriminatory motive or intent is essential." *Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 618 (11th Cir.1983), *cert. denied,* 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984) (citing *Teamsters,* 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854–55 n. 15). The framework for proving disparate treatment was established by the Supreme Court in *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Plaintiff has the initial burden of making out a prima facie case by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek

---

**12.** The other two factors mentioned by the Fifth Circuit were subject matter and frequency. *Berry,* 715 F.2d at 981. Because we find the permanence factor dispositive of Sabree's case, we express no opinion as to the viability of these other factors.

applicants from persons of complainant's qualifications.[13]  *Id.*

The outline of the prima facie case will vary with the facts of each case. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. Once plaintiff has made out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. "The explanation provided must be legally sufficient to justify a judgment for the defendant." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). To satisfy his production burden, defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been *motivated* by discriminatory animus." *Id.* at 257, 101 S.Ct. at 503 (emphasis added). If defendant meets this production burden and rebuts the prima case, plaintiff may then show that the stated reason was pretextual. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825.[14] Plaintiff may succeed "either directly by persuading the court that a discriminatory *reason* more likely *motivated* the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (emphasis added). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093.

Proving discrimination may be a difficult task for it necessarily involves a determination of intent. The *McDonnell Douglas* framework attempts to address this problem. The prima facie case "eliminates the most common non-discriminatory *reasons* for the plaintiff's rejection." *Id.* 450 U.S.

at 253–54, 101 S.Ct. at 1093–94 (emphasis added). It establishes a "legally mandatory, rebuttable presumption," *id.* at 254 n. 7, 101 S.Ct. at 1094 n. 7, because absent a legitimate explanation from the defendant "it is more likely than not that those actions were bottomed on impermissible *considerations.*"  *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978) (emphasis added).

With these cited cases, the Supreme Court has made it clear that motive and intent are at the heart of a discrimination case. For example, in *Furnco,* the Court discussed whether the defendant's actions were "discriminatorily motivated" and what factors a court should consider in determining "motivation." *Id.* at 580, 98 S.Ct. at 2951; *see also Sweeney v. Board of Trustees,* 604 F.2d 106, 112–13 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). Although it may seem evident that the term "motivation" clearly contemplates defendant's mental state at the time of an action, the Supreme Court made this crystal clear in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), stating:

> The present, active tense of the operative verbs of § 703(a)(1) ('to fail or refuse') ... turns our attention to the actual moment of the event in question, the adverse employment decision. The crucial inquiry, the one commanded by the words of § 703(a)(1), is whether [race] was a factor in the employment decision *at the moment it was made.* 109 S.Ct. at 1785.[15]

The Court added:

> In saying that [race] played a motivating part in an employment decision, we

---

**13.** It is the second factor of the prima facie case, establishing qualification, that is the subject of this appeal. Because the district court did not address the other factors after finding Sabree unqualified, we will not consider them on appeal.

**14.** One way a plaintiff may show that the stated reason for the act was pretextual is by offering evidence of defendant's prior treatment of plaintiff. *McDonnell Douglas,* 411 U.S. at 804, 93

S.Ct. at 1825. This is in keeping with the statement in *Evans* that acts outside the limitations period may constitute relevant background evidence. 431 U.S. at 558, 97 S.Ct. at 1889.

**15.** Although *Price Waterhouse* was a plurality decision, Justices White and O'Connor each wrote opinions concurring in the judgment indicating that they were in agreement with the basic proposition that motivation is the key issue in assessing a discrimination claim. *See*

meant that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of the reasons would be that the applicant or employee was [black]. *Id.* at 1790.

Although *Price Waterhouse* is a mixed motive, direct evidence case and Sabree's case is a circumstantial evidence case governed by *McDonnell Douglas*, *Price Waterhouse's* directive to essentially take a snapshot at the moment of the allegedly discriminatory act is applicable to all Title VII cases.

■ This is further emphasized by the line of cases that hold that a defendant may not invent a *post hoc* rationalization for its actions at the rebuttal stage of the case. *See EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir.1990) (where white applicant did not apply for position until after decision makers had determined black employee was not qualified, relative qualifications would not establish non-discriminatory reason); *Hill v. Seaboard C.L.R. Co.*, 767 F.2d 771, 774 (11th Cir.1985) ("Of course, failure to promote a plaintiff because the person actually promoted was more qualified is a non-discriminatory reason, but the articulation of that reason must include the fact that the decision-maker knew that the promoted individual's qualifications were superior at the time the decision was made."); *Joshi v. Florida State University Health Center*, 763 F.2d 1227, 1235 (11th Cir.), *cert. denied*, 474 U.S. 948, 106 S.Ct. 347, 88 L.Ed.2d 293 (1985) (where female plaintiff's qualifications were never compared with male applicant's qualifications, relative qualification could not be the reason for defendant's failure to hire the female applicant); *Eastland*, 704 F.2d at 626 (defendant's decision could not be defended on the basis of relative qualifications if such qualifications were not considered), *Smith v. American Service Co.*, 611 F.Supp. 321,

328 (N.D.Ga.1984) (defendant offered different justifications at different times); *Foster v. Simon*, 467 F.Supp. 533, 535–36 (W.D.N.C.1979) (requirement raised as a defense not sufficient when mentioned for the first time at trial). "[P]roving 'that the same decision would have been justified ... is not the same as proving that the same decision would have been made.'" *Price Waterhouse*, 109 S.Ct. at 1791 (quoting *Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979)). Unless, therefore, a defendant articulates a "legitimate non-discriminatory reason" that *actually* motivated the decision, the reason is legally insufficient. *See Price Waterhouse*, 109 S.Ct. at 1791.[16]

■ In Sabree's case, the by-law, which was not considered and which was only unearthed during discovery, cannot render him unqualified. It only stands to reason that the defendant could not be motivated by the by-law it did not consider when reaching its decision to deny Sabree's transfer. It follows, therefore, that for Sabree to establish this aspect of his prima facie case, he need only demonstrate he had the qualifications that the defendant actually considered when it denied his transfer. The District Court's grant of summary judgment on this basis was, thus, incorrect. We also note that the *McDonnell Douglas* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco*, 438 U.S. at 577, 98 S.Ct. at 2949. In a case such as Sabree's, where the plaintiff can point to sixteen years of circumstantial evidence of discrimination and defendant rests on a *post hoc* rationalization, it would seem contrary to the policies underlying Title VII to allow an overly narrow reading of the term "qualification" to keep the plaintiff from his day in court.

■ Even though we have held that the by-law is legally insufficient as an explana-

---

109 S.Ct. at 1796 (White, J., concurring in the judgment), *id.* at 1801 (O'Connor, J., concurring in the judgment).

While the plurality cites to language in Title VII that is directed to employers, the section of the Act directed to unions, § 703(c)(1), also uses the present, active tense ("to exclude or to expel").

**16.** In cases using the *McDonnell Douglas* framework, the defendant bears only a production burden, not a burden of persuasion as in *Price Waterhouse*, direct evidence, cases. Although the burden is lighter, the inquiry remains the same—the defendant's actual motivation.

tion for the denial, this does not mean that the by-law will play no role in the proceedings on remand. Defendants have asserted that, regardless of the reason for denying Sabree's transfer, at a later point in the transfer process Sabree's prior membership in Local 40 would have been discovered and would have legitimately barred his transfer. If the defendant can show that the by-law would have eventually barred Sabree's transfer, his damages will be reduced. It would not be equitable to allow Sabree to collect full damages if others, regardless of their race, would eventually have been denied transfers as well. In saying that the by-law affects damages, not liability, we do not run afoul of Supreme Court precedent. *Price Waterhouse* held that if the defendant can prove it would have made the same decision absent consideration of an illegitimate factor, the defendant is not liable. *See* 109 S.Ct. at 1786. We stand on solid ground, however, because *Price Waterhouse*, did not provide an absolute escape from liability. As stated above, the Court only allowed a defendant to escape liability if he was motivated by a legitimate reason *at the time of the decision*, not if the justification for the decision was pieced together after the fact. *See id.* 109 S.Ct. at 1791.

## V. CONCLUSION

There are sound policy reasons for allowing a statute of limitations to cut off a plaintiff's claims; a plaintiff cannot sleep indefinitely on his rights with the knowledge that his rights are being violated. Sabree alleges a long history of discrimination, but he admits that he knew that he was being wronged by the defendant. He had an obligation to act promptly. Fortunately for Mr. Sabree, he did act promptly with regard to the most recent incident. We will not summarily bar this timely claim on the basis of the defendant's eleventh hour justification.

*Affirmed in part, reversed in part and remanded.* Costs to appellant.