Toomey, J.
BACKGROUND
Plaintiff Judith Tritak (’Tritak”) brings this action against defendant Data General Corporation (“Data General”) and defendant Robert Van Steenberg (“Van Steenberg”) (collectively “defendants”). Tritak’s complaint alleges three counts, to wit, sex discrimination (against both defendants),[2] assault (against Van Steenberg) and negligent or intentional infliction of emotional distress (against Van Steenberg). Defendants deny any liability and move for summary judgment on the grounds that all claims are barred either by the applicable statute of limitations or by the exclusivity provision of the workers compensation act. For the reasons stated below, the defendants’ motion for summary judgment is ALLOWED.
FACTS
The following facts, taken from the depositions, answers to interrogatories and affidavits, are uncontroverted.
IN GENERAL
From May 3, 1971 until her departure on June 10, 1994, Tritak worked as a secretary at Data General. In August, 1992, Tritak began working as executive secretary to Vice President Douglas MacGregor (“MacGregor”). Although she furnished secretarial support *652 to up to 40 members of her department, Tritak was directly supervised by MacGregor who provided her with a full-time workload which frequently required her to work overtime.[3]
MacGregor, in January 1993, asked Tritak to mentor, in addition to her regular duties, Ivone Czamara (“Czamara”), a less tenured secretary who had been experiencing professional difficulties. Tritak agreed to help train Czamara, but requested additional monetary compensation because she believed that pay differential was granted for supervisory employees.[4] Although MacGregor told Tritak that he would attempt to get her a pay differential, he was told by the human resources (“H.R."} department that such differential pay was not available to secretaries. Despite not receiving the pay differential, Tritak began working with Czamara in January 1993. By September, 1993, Tritak believed that Czamara had significantly improved, and she advised MacGregor that Czamara’s performance review should reflect her improved skills and attitude.
Van Steenberg joined Data General as a vice president in mid-September 1993. Because Van Steenberg’s arrival at Data General was unexpectedly early, MacGregor offered him the interim use of Tritak as a secretary. MacGregor stressed to Van Steenberg that Tritak was already very busy with his work and her services to Van Steenberg would only be temporary. Tritak, however, believed that she could support Van Steenberg by sending Van Steenberg’s work to Czamara.[5]
THE ALLEGATIONS OF MISCONDUCT
On September 20, 1993, Van Steenberg stopped at Tritak’s desk to “purposely stare” at her breasts. When she noticed his staring, Tritak stated “excuse me,” to which Van Steenberg replied that she was wearing a nice pin.
On September 27, 1993, Tritak entered Van Steenberg’s office at approximately 8:30 P.M. to find soft music playing in the background. After inquiring whether everyone else had left for the evening, Van Steenberg approached Tritak and suggested that they have a couple of beers. She declined his offer and suggested that he join Tritak and her husband for dinner sometime at the East Park Grille.
On September 28, 1993, Tritak spoke to Don Wade, a Data General executive, about the September 27 incident with Van Steenberg (“Beer Incident”). Despite feeling that the Beer Incident was sexual harassment, Tritak believed that no further action was necessary and she thus did not report the Beer Incident to anyone in the H.R. department. At her deposition, Tritak stated that the Beer Incident was Van Steenberg’s only conduct toward her that was of a sexual nature.
In the beginning of October 1993, Tritak purchased a new Cadillac Deville and Van Steenberg teased her, asserting that he wished he could afford such a car and that it was his understanding that only older people drove Cadillacs.
Also in the beginning of October, MacGregor reiterated to Van Steenberg that Tritak was very busy and suggested that Van Steenberg should find another secretary to handle his work. On October 17, 1993, Van Steenberg informed MacGregor and Tritak that he would be using Czamara as his “lead” secretary. That same day, Van Steenberg requested that Tritak send an e-mail communication informing all employees that Czamara now would be handling his work. Tritak sent the e-mail as Van Steenberg requested.
On October 17, 1993, Tritak spoke to H.R. to express her concern that Van Steenberg had replaced her with a younger, less experienced secretary.[6] She added that she had an excellent business relationship with Van Steenberg and that they had worked well together. Tritak believed that she could continue to handle Van Steenberg’s work, in addition to MacGregor’s, by sending the additional work to Czamara.
Sometime in October 1993, Tritak suggested to Van Steenberg that Czamara was a poor performer and would be a bad choice as his secretary. Van Steenberg replied that Czamara has been performing well with him and that she was still young. Tritak then informed Van Steenberg that Czamara had been a secretary for twelve years. Van Steenberg replied that Czamara was just a few years younger than Tritak.[7]
On November 12, 1993, MacGregor announced his resignation effective in two weeks. On November 29, 1993, Tritak proposed to Van Steenberg that, in MacGregor’s absence, she should serve as his administrator, while Czamara would remain his secretary. Van Steenberg replied that he would look into it and that, in the interim, Tritak should prepare a secretarial report listing the secretaries in his department and the duties of each. Tritak questioned whether she could complete the project without knowing who her supervisor would be; Van Steenberg responded, “just fucking do it.”
Tritak prepared the secretarial report and on December 9, 1993, attended an executive staff meeting to present the report. During Tritak’s presentation, Van Steenberg interrupted Tritak and told jokes. Tritak, the only secretary present at the meeting, was also asked by Van Steenberg to take notes during the meeting. Note-taking was not a task that previous vice presidents had asked Tritak to do at staff meetings.
On December 27, 1993, Tritak arrived at work on time and was greeted by Van Steenberg who brought her into his office, slammed the door behind them, and screamed “where are my fucking faxes." Tritak stated that no faxes had arrived by quitting time the previous work day and that the missing faxes might be in the fax room. When located on a file cabinet in the fax *653 room, Van Steenberg crumpled up the fax near Tritak’s face and stated “See, I told you that you had it.”
THE AFTERMATH
On January 3, 1994, Tritak requested that she be moved to Mr. Young’s department and thus away from Van Steenberg. Her request was immediately granted and she worked with Mr. Young until her departure in June 1994.
In February 1994, Data General stated that it was planning a reduction in force (“RIF”) and offered all employees a two week window of opportunity to accept a voluntary RIF benefit package. During the window of opportunity, Tritak requested information regarding the RIF, but did not accept the offer. Mr. Young, Tritak’s supervisor, told her that he was considering accepting the RIF package.[8]
On March 3, 1994, Tritak requested a meeting with John Lane (“Lane”), director of H.R., to discuss with him the September 27, 1993 Beer Incident and other problems she was having with Van Steenberg. Tritak requested that Mr. Lane investigate the Beer Incident without drawing attention to her as she feared a reprisal from Van Steenberg.
In April 1994, Tritak interviewed for employment with the Light Stream Corporation. Light Stream offered Tritak the job of executive secretary to all of the officers of the company. The Light Stream position was offered at a higher rate of pay than she was earning at Data General, provided comparable benefits, and included an initial bonus of 500 shares of Light Stream company stock.[9] Also in April, 1994, Tritak applied and interviewed for the position of executive secretary to Mr. Wilson, an executive at Data General. Tritak was not offered that position.
On April 29, 1994, Tritak again met with Lane to discuss Van Steenberg and to request her inclusion in the RIF. Tritak knew that the two week window of opportunity for accepting the RIF package had expired, but she nevertheless asked Lane to review her eligibility. Tritak felt that, during the discussion about her allegations of Van Steenberg’s sexual harassment, Lane’s behavior was inappropriate. Tritak believed that Lane’s “manner, and the way he listened to [her], the way he talked, and what he proposed to do” were inappropriate.[10] Tritak told Lane that she did not want to take any further action regarding Van Steenberg. When Mr. Lane proposed a meeting between Van Steenberg, Tritak and himself, Tritak declined, instead requesting the RIF package “to make it easier for [her] to leave." On May 4, 1994, Tritak informed Lane that she could not leave Data General unless she was given a RIF package that would financially tide her over. Tritak added that, if she received a RIF package, she would gladly sign a release regarding her complaints of Van Steenberg.
During May, 1994, Tritak’s responsibility to support the “SA3 Group”[11] was relieved and given to a temporary employee. That temporary employee was hired on a contract basis to work with the SA3 Group at the Southboro, Massachusetts facility.
On May 11, 1994, Van Steenberg arranged for Tritak to work on a college recruitment project. Tritak responded to Van Steenberg by e-mail that she could begin the project, but that she could not finish it because she was on leave for two weeks beginning May 20, 1994.[12]
Tritak first sought medical treatment on May 12, 1994.[13] She visited Dr. McGan, an internist, and Dr. Long, a neurologist. Dr. McGan prescribed IC Clorazepate for Tritak’s high blood pressure and heart palpitations, and recommended that she quit her job at Data General for the sake of her health.
On June 6, 1994, Tritak returned to work and gave one week’s notice of her resignation. On June 9, 1994, the H.R. department informed Tritak that its investigation regarding discrimination and harassment was complete and requested a meeting with her to discuss the results. Tritak declined the invitation to meet. H.R. gave Tritak its written report on June 10.
THE LAWSUIT
On June 21, 1994, Tritak began the present action in the Massachusetts Commission Against Discrimination (“MCAD”), alleging statutory claims of age discrimination, gender discrimination and sexual harassment in violation of G.L.c. 151B (“Chapter 15 IB”) and common law claims of assault and intentional or negligent infliction of emotional distress. On February 2, 1995, Tritak removed her complaint from the MCAD and filed the instant lawsuit. Defendants have answered that the discrimination claims are barred by Chapter 151B’s six month statute of limitations and that the common law claims are barred by the exclusivity provision of the Massachusetts Workers’ Compensation Act, G.L.c. 152, §§24 and 29. Those defense theories are now pressed in the context of a Motion for Summary Judgment.
DISCUSSION
Summary judgment must be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment." Pederson, 404 Mass. at 17. The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion *654 for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
With respect to any claim on which the party moving for summary judgment will not have the burden of proof at trial, that party may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or by demonstrating “that the party opposing the motion has no reasonable expectation of proving an essential element of that [opposing] party’s case." Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). In deciding a motion for summary judgment, the court is bound to the principle that, “[ajllegations in an unverified pleading are not accorded any evidentiary weight in determining whether there exists a genuine issue of material fact under rule 56 (c).” Godbout v. Cousens, 396 Mass. 254, 262-63 (1985). Application of the above referenced precepts requires that defendants be awarded summary judgment on plaintiffs statutory and common law claims.
I. Anti-Discrimination Claims under Chapter 151B
Claims brought under Chapter 151B must be filed with the MCAD “within six months after the alleged act of discrimination.” G.L.c. 151B, §5 (1996). The six month limitations period is, however, “not a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature."[14] 804 Code Mass. Regs. § 1.03(2) (1993). See Lynn Teachers Union, Local 137 v. Massachusetts Comm’n Against Discrimination, 406 Mass. 515, 521 (1990). At bar, the timing of the alleged acts of discrimination is such that, for plaintiff to avoid succumbing to the statute of limitations, the record must demonstrate that defendants engaged in such continuing misconduct. Continuing violations come in two varieties, systemic and serial. Sabree v. United Bhd. of Carpenters and Joiners, Local 33, 921 F.2d 396, 400 (1st Cir. 1990).[15] Systemic violation “cases challenge a system-wide employment practice” whereas serial violation cases involve a “series of adverse acts against an individual.” Id. at 400 & n.7; Barrow v. Falmouth School Committee, 3 MDLR 1185, 1190 n.4 (1980).[16] We shall examine the summary judgment submissions in the instant matter to determine whether factual issues are presented with respect to either type of continuing violation.[17]
A. Systemic Violations
A systemic violation arises where there has been a long-standing and demonstrable policy of intentional discrimination against a class of individuals of which the plaintiff is a member. E.E.O.C. v. Penton Indus. Pub. Co., 851 F.2d 835, 838 (6th Cir. 1988) (citations omitted); Barrow, 3 MDLR at 1189. Isolated or sporadic acts of intentional discrimination are not sufficient to establish a policy of systemic discrimination. Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990); Penton Indus. Pub. Co., 851 at 838. Thus, to demonstrate a continuing violation of the systemic sort, the summary judgment materials must evidence (i) an employment practice of general applicability to a class of employees, (ii) that the practice was unlawful, and (iii) that the practice was in existence and had an effect on the plaintiff during the limitations period. See Penton Indus. Pub. Co., 851 F.2d at 838; Barrow, 3 MDLR at 1189.
Tritak alleged that she was subjected to continuing violations in the nature of age discrimination, gender discrimination and sexual harassment. In support of her claim of age discrimination, Tritak argues that Van Steenberg replaced her with a younger, less experienced secretary and that, on two occasions, Van Steenberg made references to her age.[18] In support of her claim of gender discrimination, Tritak offered only one example, to wit, Data General’s refusal to increase her salary for supervising Czamara, despite its having increased the salary of a male technician on account of his supervisory services. In support of her claim of sexual harassment, Tritak maintains that Van Steenberg’s conduct included “a proposition and a rebuff on September 27, 1993, and a continuing course of events which culminated in her constructive discharge on June 10, 1994.”
Those isolated and, indeed, ambiguous incidents of alleged discrimination and harassment do not rise to the level of general employment policies or practices of intentional age or gender discrimination or of sexual harassment. Isolated or sporadic acts of intentional discrimination are not enough to establish a policy of systemic discrimination. Jensen, 912 F.2d at 523. Moreover, there is no evidence that the allegedly discriminatory policies were directed at a class of individuals of which Tritak was a member. The summary judgment materials cannot, therefore, be said to demonstrate the existence of genuine issues of material fact with respect to continuing violations of the systemic strain.
B. Serial Violations
A serial violation may occur in the context of a series of related unlawful acts against an individual in which one or more of the acts occurred within the statutory ' period. Such a violation “is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate” civil rights violation, with at least one of the unlawful acts occurring within the limitations period. Sabree v., 921 F.2d at 400; Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 183 (1st Cir. 1989); Goldman v. Sears, Roebuck & Co., 607 F.2d 1014, 1018 (1st Cir. 1979). Thus, if the later acts, occurring within the statute of limitations, are to rescue an out-of-time earlier act from the statute of limitations defense, there must be some evidence indicating that the later acts “were themselves civil rights violations.” Goldman, 607 F.2d at 1018; Desrosiers v. Great Atlantic & Pacific Tea Co., *655 885 F.Supp. 308, 312 (D.Mass. 1995) (summary judgment granted in favor of defendant because untimely sexual harassment was followed by a timely act, but one that did not itself constitute sexual harassment).[19]
At bar, the issue is clearly engaged. Defendants argue that all the unlawful acts alleged at bar occurred prior to the six-month limitations period and, therefore, all claims pursuant to Chapter 151B are time-barred. Tritak counters that her claims were timely filed because they were based on a pattern of harassing retaliatory conduct, the latest of which continued into the six month limitations period.
Tritak filed her complaint with the MCAD on June 21, 1994, claiming age discrimination, gender discrimination and sexual harassment. To take advantage of the serial aspect of the continuing violation rule and defeat summary judgment, Tritak must be able to point to evidentiary items in the summary judgment materials that suggest some unlawful discriminatory act, in connection with one or more of her three claims, occurring on or after December 21, 1993. Let us examine each genre to determine whether or not a qualifying showing has been made as to any of them.
1.Age Discrimination
The latest act[20] alleged by Tritak in support of her claim of age discrimination was Van Steenberg’s October 12, 1993, replacement of her with Czamara, a younger, less experienced secretary.[21] Tritak responds that Czamara was not named Van Steenberg’s secretary until January 1994 and argues that that act satisfies the limitations period. The record facts do not, however, support Tritak’s argument.
On October 12, 1993, Van Steenberg told MacGregor and Tritak that he would no longer be using Tritak as a secretary and instead would use Czamara because Tritak was very busy with MacGregor’s work. Tritak herself sent out the e-mail on that day informing the staff that she would no longer be supporting Van Steenberg. In addition, Tritak has asserted that, in October 1993, she complained to H.R. about Van Steenberg’s decision to make Czamara his lead secretary.[22]
The formal naming, in January, 1994, of Czamara as Van Steenberg’s secretary was not, in that context, a defining act of age discrimination. Thus, the only act of age discrimination alleged by Tritak — viz, that she was replaced by a younger, less experienced secretary — occurred on October 12, 1993, or, at the latest, in November 1993, and well before the December 21, 1993 limitations inception date. The age discrimination claim is, therefore, barred by the six month statute of limitations.
2.Gender Discrimination
The only evidence of gender discrimination offered by Tritak is Data General’s refusal to increase her salary when she trained Czamara in contrast to its increase of a male employee’s salary when he became a supervising technician.
Tritak supervised Czamara from approximately January, 1993, until October 12, 1993, when Van Steenberg began using Czamara as his lead secretary. Tritak has not alleged that she supervised Czamara, or any other secretary, after October 12, 1993. Therefore, even assuming that Data General’s failure to increase Tritak’s pay constituted unlawful discrimination, no acts of gender discrimination have been alleged to have occurred on or after the December 21, 1993 trigger date. The gender discrimination claim is thus also time-barred.
3.Sexual Harassment
Defendants contend that Tritak admitted at her deposition that the Beer Incident of September 27, 1993, was the only conduct of a sexual nature of which she was complaining.[23] Defendants conclude that the sexual harassment claim was thus not timely filed. Tritak counters that Van Steenberg’s rebuffed sexual advance of September 27, 1993, precipitated a continuing course of harassing acts, the last of which occurred within the limitations period, thereby permitting the September 27, 1993, act of sexual harassment to be claimed timely pursuant to the continuing violations rule.[24]
Assuming arguendo Tritak’s version of the facts, there may indeed have been a causal relationship between Van Steenberg’s out-of-time sexually harassing conduct and his subsequent, in-time non-sexual conduct. However, causal relationship, by itself, is not enough to establish a serial violation. Desrosiers, 885 F.Supp. at 312.
At her deposition, Tritak testified that she considered herself to have been sexually harassed by the Beer Incident and discussed it with Mr. Wade on September 28, 1993. But, she further testified that no acts of a sexual nature occurred thereafter.[25] As stated above, the continuing violation rule for serial violations is only available to avoid the statute of limitations if the in-time acts were themselves unlawful discrimination or harassment. Sabree, 921 F.2d at 402. In addition, the post-September 27, 1993, acts identified in Tritak’s memorandum as a pattern of continuing sexual harassment were not sexual in nature. Thus, like the harassing, but non-sexual, conduct in Desrosiers, the acts alleged at bar are not unlawful. They may well have been insensitive, churlish acts of business boorishness, but they were not unlawful and may not now be employed to shift the pre-trigger act of sexual harassment into the limitations period.
Therefore, with respect to Tritak’s statutory claims, the proffered evidence does not demonstrate either systemic violations or serial violations. The Chapter 15 IB claims of age discrimination, gender discrimina *656 tion and sexual harassment are barred by the six month statute of limitations.
II. Common Law Claims
Van Steenberg contends that Tritak’s common law claims of assault and negligent or intentional infliction of emotional distress are barred by the exclusivity provision of the Massachusetts Workers’ Compensation Act (the “Act”). Tritak counters that the Act does not bar lawsuits seeking redress against a co-employee for intentional torts in the context of sexual harassment.[26]
Common law personal injury and wrongful death claims against one’s employer and co-employees are barred by the Act. G.L.c. 152, §15.[27] Specifically, the Act “bars an employee injured in the course of his or her employment by the negligence of a fellow employee from recovering from that fellow employee if the fellow employee also was acting in the course of employment.” Anzalone v. Massachusetts Bay Transit Authority, 403 Mass. 119, 124-25 (1988). Conduct of an employee is within the scope of employment if “it is of the kind he is employed to perform . . . ; if it occurs substantially within the authorized time and space limits . .. ; and if it is motivated, at least in part, by a purpose to serve the employer . . .” Doe v. Purity Supreme, Inc., 422 Mass. 563, 565-67 (1996) (citations omitted).
In support of her argument that, unlike negligence, intentional torts, such as assault do not, in law, arise out of or in the course of employment, Tritak relies on O’Connell v. Chasdi, 400 Mass. 686, 690-91 (1987). In O’Connell, the defendant co-employee was alleged to have “repeatedly made physical advances toward [the plaintiff] placing his hand on her knee, hugging her, stroking her hair and face, and attempting to hold her hand.” Id. at 687. The O’Connell court denied summary judgment for defendant on claims of assault and battery and intentional infliction of emotional distress, holding that the intentional acts were “in no way within the scope of employment furthering the interests of the employer.” Id. at 690. But cf. Anzalone, 403 Mass. at 125 (the Act barred claim of intentional infliction of emotional distress by a co-worker where the complained-of conduct “related wholly to [defendant’s] position as [plaintiffs] supervisor and to the manner in which [defendant] exercised his supervisory duties”); Albanese’s Case, 378 Mass. 14, 14-15 (1979) (emotional distress claim barred by the Act where plaintiffs supervisor intentionally attempted to undermine plaintiffs relationship with co-workers through a series of humiliating incidents). Our task now is to examine the summary judgment materials to determine whether, with respect to either of Tritak’s common law causes of action, the tortious conduct occurred within the “scope of employment.”
A. Assault
In support of her claims of assault, Tritak argues that Van Steenberg’s conduct included “lying, sarcastic remarks, age-related comments, humiliating treatment, use of vulgarity, aggressive confrontations and criticisms.” Van Steenberg contends that the alleged conduct occurred within the context of his capacity as vice president and specifically dealt with work-related issues. A lawsuit upon the conduct, he argues, is thus barred by the exclusivity provision of the Act.
Tritak has not specified the conduct she alleges to be assaultive and her argument suffers greatly from that omission. Even a generous culling of the record produces only a few instances of even arguably assaul-tive conduct by Van Steenberg, to wit: in responding to Tritak’s question regarding an assignment, Van Steenberg stated, “just fucking do it”; he slammed the door behind them, and screamed “where are my fucking faxes”; and he crumpled up the fax near Tritak’s face. Assuming, arguendo, the doubtful proposition that such conduct supports each of the elements of a claim of assault, that conduct, like the plaintiffs acts in Anzalone, was wholly occasioned by Van Steenberg’s position as Tritak’s supervisor and was a function, albeit a loutish one, of his exercise of his supervisory duties. His conduct, no matter how crude, arose in the course of Van Steenberg’s employment by Data General, and, therefore, Tritak’s assault claim against Van Steenberg is barred by the Act. See Anzalone, 403 Mass. at 124-25.
B. Negligent and Intentional Infliction of Emotional Distress
In support of her claims of negligent or intentional infliction of emotional distress, Tritak argues that Van Steenberg’s conduct included “lying, sarcastic remarks, age-related comments, humiliating treatment, use of vulgarity, aggressive confrontations and criticisms.” Tritak provides us with no further specificity regarding which of the alleged acts constitute intentional or negligent infliction of emotional distress. We need not pause at that failing, however, because Van Steenberg’s conduct, as generally alleged by Tritak, consisted wholly of work-related incidents between Van Steenberg and Tritak as, respectively, supervisor and secretary. See Albanese’s Case, 378 Mass. at 14-15 (”[I]f an employee is incapacitated by a mental or emotional disorder causally related to a series of specific stressful work-related incidents, the employee is entitled to compensation” under the Act). Therefore, Tritak’s present claims for emotional distress are barred by the Act.
Even assuming, arguendo, that the referenced acts constituting negligent or intentional infliction of emotional distress were outside the course of Van Steenberg’s employment and not barred by the Act, they are nevertheless precluded by the exclusivity provision of Chapter 151B. We are instructed by Green that, “[i]nsofar as plaintiffs claims are merely recast versions of sexual harassment claims under c. 151B, they are barred by that statute’s exclusivity provision.” Green v. Wyman-Gordon, 422 Mass. at 558. Compared *657 with Tritak’s allegations supporting her sexual harassment claim, viz, “Van Steenberg insulted, criticized, leered at, raged against, swore at, intimidated, sabotaged the work of, and caused work to diminish for Tritak,” the allegations supporting her common law claims, viz, “lying, sarcastic remarks, age-related comments, humiliating treatment, use of vulgarity, aggressive confrontations and criticisms,” amount to nothing more than recast versions thereof. Therefore, even if Tritak’s claims of negligent or intentional infliction of emotional distress are not barred by the Act, they are occluded by the exclusivity provision of Chapter 151B, and her claims of assault and negligent or intentional infliction of emotional distress against Van Steenberg must necessarily fail.
ORDER
For the reasons stated aboye, it is hereby ORDERED that defendants’ motion for summary judgment is ALLOWED.

 Although Count I asserts only sex discrimination, Tritak also alleges sexual harassment and age discrimination in the introduction of her complaint and in her memorandum. Accordingly, in the interests of resolving all of Tritak’s issues notwithstanding their procedural posture, this court will address the three theories of statutory offense.

 Each vice president at Data General had a lead secretary who handled all of that vice president’s work.

 Tritak knew of only one employee who received additional compensation for supervising. In March 1993, Data General increased the salary of Carlos Cordeiro when he was promoted to supervisor of several engineering technicians.

 Czamara did not have a heavy workload and in fact would often receive plaintiffs extra work.

 Between September 1993 and March 1994, Tritak spoke with Patty Reilly Lemire, her H.R. representative, approximately twelve times regarding Van Steenberg’s inaccessibility and abusive language. Tritak never discussed any incident of sexual harassment or discrimination, nor did she allude to any conduct of a sexual nature.

 In October 1993, plaintiff was 49 years old and Czamara was approximately 35 years old.

 Mr. Young did not accept the RIF, but did leave Data General in mid-June 1994, one week after Tritak’s departure.

 Although Tritak was orally offered the job in April, she did not receive a written offer until May 11, 1994. In addition, although she orally accepted Light Stream’s offer in April or early May, Tritak did not sign an agreement with Light Stream until June 1994.

 Tritak’s deposition and affidavit do not shed light on exactly how Mr. Lane’s behavior was inappropriate.

 The SA3 Group was a Data General work group located in Southboro, Massachusetts. Plaintiff worked in the Westborough office and had never been to the Southboro facility.

 At her deposition, Tritak stated that, on May 11, 1994, she requested two weeks of medical leave beginning May 20. During subsequent deposition questioning, however, she stated that she may have requested vacation leave for that period.

 Tritak claimed that, in December 1993, she first began experiencing an aggravated back condition, severe headaches, loss of appetite, sleeplessness, extreme nervousness, heart palpitations and anxiety attacks.

 "The purpose of this ‘continuing violation’ rule is to permit the Commission to ‘remedy ongoing discriminatory policies by an employer.’ ” Lynn Teachers Union, Local 137, 406 Mass. at 521 (1990), quoting Rock v. Massachusetts Comm’n Against Discrimination, 384 Mass. 198, 207 (1981).

 In interpreting Chapter 151B, Massachusetts courts may apply federal case law construing federal anti-discrimination statutes. Wheatley v. American Tel. & Tel. Company, 418 Mass. 394, 397 (1994), citing Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 135-39 (1976).

 “MDLR” is the Massachusetts Discrimination Law Reporter which reports the decisions of the Massachusetts Commission Against Discrimination.

 Tritak’s memorandum in support of summary judgment is not clear on whether the claimed continuing violations were systemic or serial; accordingly, both species are addressed herein.

 In addition, Tritak’s memorandum in opposition to summary judgment alleged that, in April, 1994, she applied and interviewed for an executive secretary position which was ultimately offered to a younger, less-experienced woman. The affidavits and discovery did not evidence that fact, but Tritak’s memorandum in opposition cited her unverified complaint as support for the allegation. Assertions set forth in an unverified complaint, however, have no evidentiary weight in the resolution of a motion for summary judgment, see Godbout, 396 Mass. at 262-63, and we must, therefore, refrain from viewing the allegation as supporting the existence of a genuine issue of material fact.

 Moreover, “the discriminatory act, not merely the effects of a past discriminatory act, must occur within the limitations period." Sabree, 921 F.2d at 400, citing United Airlines, Inc. v. Evans, 431 U.S. 553, 557-58 (1977).

 Van Steenberg had made two earlier comments to Tritak that were related to her age.

 Tritak’s memorandum also alleged that Data General’s organizational chart did not list Czamara as Van Steenberg’s secretary until December 1993. This allegation, however, is contradicted by the verified record in which Tritak stated that the organizational charts were updated, in November 1993, to reflect Czamara’s becoming Van Steenberg’s secretary.

 Additionally, on November 29, 1993, Tritak discussed with Van Steenberg the possibility of her being his administrator while Czamara remained his secretary.

 Tritak was asked: “was the conduct of Van Steenberg sexual other than the incident as you allege it on September 27, 1993?” Tritak answered, “No.”

 Specifically, Tritak’s memorandum in opposition to summary judgment argued that the following thirteen events constitute sexual harassment and collectively indicate a continuing violation; “(1) October 12, 1993, replacement of Mrs. Tritak with younger, less qualified, employee whom she had supervised, and an age-related remark by Mr. Van Steenberg; (2) October 1993 failure of Ms. Reilly-Lemire to explain the replacement and her statement that Mr. Van Steenberg could do whatever he wanted; (3) November confrontation with Mr. Van Steenberg on Mrs. Tritak’s job responsibility; (4) December 9, 1993, humiliating treatment of Ms. Tritak by Mr. Van Steenberg at staff meeting; (5) late December, 1993, missing fax incident (swearing, slamming door, fist in face); (6) late December alphabetical list incident (swearing, fist in face); (7) January, 1994, through March of 1994, constant monitoring, criticism and sabotaging by Mr. Van Steenberg of status of reviews and alias mailing list projects assigned to Mrs. Tritak; (8)March9, 1994, and April 29, 1994 meetings with Mr. Lane in which he commented on her ‘revealing’ clothing and did *658 not employ the formal complaint process; (9) April 1994, East Park Grille remark by Mr. Van Steenberg; (10) token job interview with Mr. Wilson in April 1994; (11) May 6, 1994, rage of Mr. Van Steenberg at 8:30 meeting, failure to appear at 4:30 meeting or to give Mrs. Tritak necessary slides; (12) removal from Mrs. Tritak of responsibility for SA3 group on May 6, 1994; and (13) assignment of college recruiting project to Mrs. Tritak in May, one week before she was to take medical leave.” Numbers 5,6,7 and 8 contain information that is not supported by the verified record and thus will not be accorded evidentiary weight. See Godbout, 396 Mass. at 262-63.

 Tritak also asserted in her memorandum in support of summary judgment that, in April, 1994, Mr. Lane commented on her “revealing clothing.” However, the above comment attributed to Mr. Lane is not supported in the verified record, and is accorded no evidentiary value. See Godbout, 396 Mass. 262-63.

 Tritak’s complaint does not lodge either of the two common law claims against Data General. Moreover, such common law claims, if brought, would have failed. See G.L.c. 152, §24 (1996) (common law personal injury claims against an employer which are compensable under the Act are otherwise barred unless the employee gave written notice, prior to starting work, that he or she elected to retain those rights) (emphasis added). See also Green v. Wyman-Gordon Co., 422 Mass. 551, 558-61 (1996); Doe v. Purity Supreme, Inc., 422 Mass. 563, 565-67 (1996).

 “Nothing in this section ... shall be construed to bar an action at law for damages for personal injuries or wrongful death by an employee against any person other than the insured person employing such employee and liable for payment of the compensation provided by this chapter for the employee’s personal injury or wrongful death and such insured person’s employee.” G.L.c. 152, §15 (emphasis added).