Fabricant, J.
INTRODUCTION
This is an action by plaintiff Grace Cuddyer against her employer, Stop & Shop, alleging that over the course of her twenty-two-year employment she has been subjected to a sexually hostile environment in violation of the Fair Employment Practices Act, General Laws Chapter 15 IB. This matter is before the court on the defendant’s motion for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons discussed below, the defendant’s motion will be allowed.
BACKGROUND
The evidence offered in connection with the present motion is voluminous. The Court has reviewed all of it, as well as the characterizations of it provided in the memoranda of counsel and statements pursuant to Superior Court Rule gAfbKS).[1] Only those portions of the evidence that bear op this motion will be set forth. Where testimony conflicts, the version presented is that most favorable to the plaintiff as the party opposing the motion.
Since February 5, 1973, plaintiff Grace Cuddyer has been employed by the defendant Stop & Shop Supermarket Company (Stop & Shop) in the Manufacturing Division of its Readville facility. Out of approximately 120 employees working in the Manufacturing Division, only about 6 or 7 are women.[2] Since her hire, Cuddyer has worked in the commissary on a variety of production lines, including the soda line, boxing line, and cold-kitchen line.
The commissary staff includes employees at three levels: supervisors, foremen, and line workers. Supervisors are salaried, non-union employees, exempt from labor regulations regarding overtime and the like. They direct the manufacturing operations, assign personnel to the various production lines, and address any disciplinary or other problems. Each production line has one or two foremen on each shift. Foremen are non-exempt employees, members of the collective bargaining unit, paid on an hourly basis at rates set by the collective bargaining agreement slightly higher than the rates of line workers, and trained on the operation of the equipment on a particular line. The *492 function of the foremen, as described by Stop & Shop’s witnesses, is to implement instructions given by supervisors as to what work was to be completed for the day, to “direct people,” to “inform people of labor changes” such as “what labels to have ready and so forth” and in case of problems, to “call maintenance or ... call your supervisor.” Foremen “have no responsibility for the hiring, firing, discipline, attendance, scheduling, evaluation, promotion, transfer, benefits or grievance of any employees.” Foremen do, however, “tell an employee where on the line that they would be working,” schedule workers’ breaks, and receive requests from workers to leave the line during the shift, such as to visit the restroom. Union business agent Arthur Lazzazero, in his deposition testimony, described the role of the foremen as follows: “[TJhey would run a line or a section. They’re responsible for production on that line.” The plaintiff, similarly, testified that foremen “tell you where [on the line] to go . . . They run the line, and they tell you what to do.” The plaintiff also testified that “[t]hey try to make a decision who’s to work on their line.”
Stop & Shop first promulgated a written sexual harassment policy in the 1980s. The policy was contained in the corporate policy guide given to upper management, and was posted in work areas such as the break room and employee bulletin boards. The company held informal meetings in the late 1980s with groups of employees to discuss its policy on sexual harassment, and conducted training on sexual harassment for all salaried management employees. In 1991 or 1992, Stop & Shop terminated a male dairy employee for inappropriately touching other male workers and making comments with sexual overtones.
The events that are the subject of this case include incidents spanning the term of Cuddyer’s employment with Stop & Shop. The first incident occurred within a couple of years after she first became employed in 1973. On that occasion, when Cuddyer went to her car in the parking lot after work, she found “a big folder of Playgirl" on her windshield. Cuddyer believed at the time that she had been sexually harassed. In the parking lot on her way into work the next morning, Cuddyer happened to see Alan Goodman, who, according to her deposition testimony, “was not management, he was in quality control.”[3] She told him “about the incident and that she was upset.” Goodman “kind of tried to say ‘Oh, it was no big deal.’ ” Cuddyer went home, rather than going into work that day, but did not tell anyone in management why she did so, because “I didn’t want to start trouble, and A1 thought it was a big ha-ha, so I thought everybody else would, too.”
The next incident, or set of incidents, involved supervisor Billy Leach. According to Cuddyer’s deposition testimony, Leach would make comments to her such as “can I touch you once, can I kiss you in your ear, can I kiss your belly button,” and “come on, just one time, just one time.” Cuddyer perceived these comments as sexual harassment, but did not complain to management because “He’d just make my work harder .. . because he’s done it a couple of times if I told him, ‘Leave me alone.’ ” Cuddyer testified also that Leach treated other women similarly, and that “[t]he other women never reported anything on Billy” and “I didn’t want to be the first.” Cuddyer did complain to union steward Jimmy Beggan, who had also observed Leach’s behavior. Beggan complained to the director of personnel, but according to Beggan’s deposition testimony, management did “nothing.” The evidence offered does not establish the dates of Leach’s conduct, beyond Cuddyer’s testimony that it was “quite a while ago.” The defendant’s memorandum places these events in the 1980s, and Cuddyer’s opposition does not suggest that that assertion is in dispute.[4]
Another series of incidents involved Pedro Cordero, a line worker with whom Cuddyer worked on the cold-kitchen line. Beginning in 1986 or 1987 and continuing until sometime prior to September 7, 1994, Cordero made comments to Cuddyer to the effect that “I have a beautiful body, nice boobs, nice fanny.” Cuddyer testified at one point in her deposition that these comments occurred at least once a month; elsewhere in her testimony she said that they occurred “just about” “every single day.” On one occasion sometime before September of 1994, Cordero came up to Cuddyer and said, “Grace, I had a dream about you ... I had a dream of you sticking your finger up my ass and, boy, it felt good.” Cuddyer perceived Cordero’s conduct as sexual harassment, but did not report it to Stop & Shop management at the time. She did tell co-worker Virginia Gibson about the dream incident and then, a month later, reported it to Beggan. “Jimmy [Beggan] spoke to him,” and Cordero ceased his conduct. According to Cuddyer’s deposition testimony, Cordero engaged in no harassing conduct after September 7, 1994.
Cuddyer worked with foreman David Arce on the soda line. On Saturday, February 16, 1991, while working on the soda line, Cuddyer asked foreman A1 Pearson for permission to go to the ladies’.room, to which he responded, “Oh, it’s that time of the month again.” A short time after returning from the ladies’ room, Cuddyer felt something banging up against her. Arce had retrieved a sanitary pad from a dumpster, poured raspberry syrup on it, crawled under the machinery to sneak up behind Cuddyer, and stuck the pad to her back. Cuddyer removed the pad, went to the office of supervisor John Allen, showed him the pad and stated, “I can take a joke, but this is ridiculous. This has just gone too far.” Allen left the office and ordered Pearson to shut the soda line down and to send Arce to his office. Allen told Arce that the joke was in bad taste and that he had shown poor judgment. Arce stated that he knew what he had done was wrong and that he wanted to apologize. Arce, accord *493 ing to Cuddyer’s deposition testimony, “begged for my forgiveness, and he was hysterical and sorry he did it.” Asked whether he seemed sincere, Cuddyer responded “yes.” She testified that she “wouldn’t answer him for a while . . . Then I did forgive him. I said ‘Okay, just leave me alone.’ ” Allen then said, according to Cuddyer’s testimony, “It’s done and over with. Let’s just forget it and go on to do our work.” Allen did not report the incident to Stop & Shop’s human resources department, although the company’s sexual harassment policy required that he do so.
At the end of that day both Cuddyer and Allen left for vacation. While they were away, Beggan informed Personnel Manager Nancy Cleary about the incident, stating that Cuddyer and the other women in the commissary, Roberta Chase and Virginia Gibson, were upset about it. Cleary suspended Arce on February 22 pending a hearing. On February 28, Alan Goodman, then General Manager of the Readville facility, received information that on another occasion, Arce had thrown a condom at Chase in the cafeteria. On March 6, following a hearing at which Arce was represented by the union, Stop & Shop discharged Arce for sexual harassment. The union grieved the termination, and the grievance proceeded to arbitration. Cuddyer testified at the arbitration hearing, saying that she did not want Arce to lose his job but did want him punished. No evidence was offered at the arbitration hearing regarding the condom incident. On June 18, 1991, the arbitrator ruled in favor of the union, concluding that four months suspension without pay was sufficient punishment for the single incident of misconduct shown at the hearing. Pursuant to the arbitrator’s order, Stop & Shop reinstated Arce as a foreman on the soda line.
Before Arce’s return, company managers held separate meetings with female employees, supervisors, and all commissary employees. At each meeting, managers announced that the company disagreed with the arbitrator’s decision and would not tolerate sexual harassment. The company also posted notices in the workplace about company policy on sexual harassment. Managers met with Arce prior to his reinstatement, informed him of the company’s disagreement with the arbitrator’s decision, and warned him against further misconduct of a sexual nature. He was not, however, given any training regarding sexual harassment.
Following Arce’s return, Cuddyer worked mostly on the boxing or cold kitchen lines, but at times also worked on the soda line, which offered more opportunities for overtime than other lines did. Arce did not engage in any further sexual harassment toward Cuddyer, but did treat her with hostility, making comments to the effect that it was her fault that he had lost four months pay, making false reports about her to her supervisor, and the like. Cuddyer complained of this treatment to union steward Beggan or union business agent Arthur Lazzazaro, who advised her not to complain to company management. She followed that advice, except on one occasion when she and another woman complained to management that Arce and Pearson were giving them “hard times ... on the line.” Discussion ensued regarding alleged inadequacies in Cuddyer’s work, and no disciplinary action resulted.
In 1993, Cuddyer frequently worked with foreman Henry Sanchez (Sanchez) on the cold kitchen line. Several times a week, Sanchez would ask her for a date, making statements such as “I’ll take care of you. I’ll give you money. I’ll help you out. You won’t have to work any overtime. You won’t have to work hard.” He would also bump into her, rub against her if she was bending over, banging his arm into her breasts, and pull strands of her hair, saying that he would take them to a witch doctor to make her fall in love with him. When she refused his advances, according to her deposition testimony, “he would either make my job harder for me or try to get me thrown out of the cold kitchen.” Cuddyer complained of this treatment both to union representatives and to company management. Personnel Manager Nancy Cleary met with Sanchez, who denied the allegations. Sanchez was warned but not otherwise disciplined, and thereafter ceased engaging in such conduct. Cuddyer testified at her deposition that Sanchez has not engaged in such conduct since sometime prior to September 7, 1994.
A1 Pearson worked as a foreman on the soda line. Pearson used vulgar language and swear words, and would “go up behind the quality control, and he’d move his body and flash his shirt up and kind of wiggle” and “joke around and throw a dirty remark or suggestion into it.” Cuddyer viewed this conduct as sexual harassment. She complained of the vulgar language to supervisor John Allen, but did not complain of the other conduct “because it wasn’t toward me.” On other occasions Pearson asked Cuddyer, “Is it that time of the month again?” or “Are you grouchy because it’s that time of the month again?” Cuddyer complained of these comments to union officials, who discouraged her from bringing her complaints to company management.
On September 7, 1994, the glue machine on the soda line jammed. Such jamming was a regular occurrence; employees would solve the problem by putting on gloves and reaching into the five gallon pail of glue to remove labels stuck inside. Pearson performed that procedure and then stood behind Cuddyer, with glue dripping off of his glove, holding his hands by his groin and jerking them back and forth as if he were masturbating. This shocked and upset Cuddyer, who was the only person in a position to observe his conduct. After several days of silence, Cuddyer discussed the incident with a co-worker, and then reported it to supervisor Gary Mulrey. Mulrey questioned Pearson, who responded that he had only shaken excess glue off his *494 gloves, as workers did routinely, and that Cuddyer had misinterpreted what she saw. Mulrey reported Cuddyer’s complaint to management personnel, who held a meeting with Cuddyer, Pearson, and union representatives Beggan and Lazzazero on September 23,1994. When called upon at this meeting to describe the incident, Cuddyer became upset and had to be helped out of the room. Pearson again denied the allegation against him. He was warned of possible termination for any future sexual harassment, but not otherwise disciplined for this incident. However, Goodman instructed Mulrey to keep Pearson and Cuddyer apart whenever possible. The day after the meeting, Pearson wore a fluorescent sticker on his hat saying, “Beware.” Cuddyer believed this was directed at her. After the September 7, 1994, incident, Pearson did not engage in any further conduct that Cuddyer views as sexual harassment, but he did, according to her deposition testimony, “give [her] a very hard time.”
At the September 23 meeting, Cuddyer also for the first time complained to management about the incident in which Pedro Cordero had told her about a sexual dream about her. Management took no action on that information at that time.
On March 6, 1995, Cuddyer filed a charge of discrimination with the MCAD. Her charge identified the date of the violation as September 7, 1994, and described the violation as follows:
I feel I was discriminated against based on my sex. I have been at the company for 22 years now. My foreman, David Arce, constantly created a hostile work environment for me. Mr. Arce blamed me for everything since I had gotten him fired in the past. (However, he was given his job back.) Up until 12/94, I was working in a hostile environment. In 12/94, Mr. Arce left the job and the male co-workers are blaming me for this. In Sept. 1994 A1 Pearson made gestures at the glue machine as though he were masturbating. I went and reported Mr. Pearson. There was a meeting and nothing was done. There was also an incident where a co-worker by the name of Pedro told me he had a dream about me and I was doing a sexual act to him. Therefore, I charge the Stop & Shop Manufacturing Division, with unlawful discrimination in employment based on my sex (female) and retaliation in violation of M.G.L.c. 15 IB, section 4 and paragraph 1 and Title VII of the 1964 Civil Rights Act.
After receiving notice of the MCAD complaint, Stop & Shop managers investigated the Cordero incident by speaking to Cordero, Beggan and various supervisors. Cordero admitted having told Cuddyer he had a dream about her and that he thought she was pretty, but denied any conversation of a sexual nature. Cordero was warned of the consequences of sexual harassment, but not otherwise disciplined. Also following Cuddyer’s MCAD charge, Stop & Shop increased its efforts to disseminate and enforce its sexual harassment policy, holding a training session for all employees in the Readville facility, as well as semi-annual review meetings.
On September 12, 1996, the MCAD issued a finding of probable cause on Cuddyer’s charge. Cuddyer filed her complaint in this action on September 23, 1997. Sometime during that same month — the evidence leaves unclear whether before or after the filing of the complaint — Henry Sanchez was standing behind Cuddyer while she leaned over a table on which some boxes were stacked. Sanchez drew a sketch, and then lifted a box to show the sketch to another worker. Cuddyer saw the drawing, and perceived it as depicting her body bending over. She complained to Beggan and to the Director of Manufacturing. Goodman held a meeting, at which Sanchez denied that the drawing was directed at Cuddyer, expressed shock at her perception of it, and stated that the drawing was of a dog. Goodman examined the drawing and thought it looked like a dog or a camel. Goodman ordered that Cuddyer and Sanchez be separated, but took no other action. Aside from this incident, Cuddyer has not experienced sexual harassment at Stop & Shop since the glue incident on September 7, 1994, but has experienced hostile treatment from foremen and coworkers, which she attributes to her complaints of sexual harassment.
Regarding the effects of her workplace experience on her, Cuddyer offers the opinion of psychologist John Daignault. Dr. Daignault opines that Cuddyer “suffers from severe psychological disorders which are directly causally related to persistent episodes of sexual harassment and its sequelae allegedly perpetrated upon her in her workplace.” In particular, according to Dr. Daignault, Cuddyer’s diagnoses include “Major Depression, recurrent, and Post Traumatic Stress Disorder.” Dr. Daignault does not make any attempt to identify the causative role of any particular incident or group of incidents, from among all of those related to him by the plaintiff, or to pinpoint the time when Cuddyer’s condition arose, nor does he address the role, if any, of non-sexual pressures or mistreatment in the workplace, in causing Cuddyer’s present condition. He does discuss and reject the possibility that certain non-work related experiences might have contributed to Cuddyer’s condition.
Cuddyer’s original complaint set forth six counts: sexual harassment in Count I, gender discrimination in Count II, negligent supervision and retention in Count III, intentional infliction of emotional distress in Count IV, negligent infliction of emotional distress in Count V, and a claim for punitive damages in Count VI. In February of 1998, Cuddyer stipulated to the dismissal of Counts III, IV and V, leaving her claims of sexual harassment and sex discrimination, along with her claim for punitive damages. Stop & Shop now moves for summary judgment on the remaining counts of the complaint.
*495 DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Corrections, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case, or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourovacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson v. Time, 404 Mass. at 17.
Stop & Shop moves for summary judgment on the ground that only two of the incidents Cuddyer alleges — the September 7, 1994, incident with A1 Pearson and the glue machine, and the September 1997 incident with Henry Sanchez’s drawing — fall within the six-month limitations period prior to the filing of the MCAD charge, and those two are not sufficiently egregious or pervasive to constitute sexual harassment. As to the latter incident, the defendant argues also that Cuddyer’s failure to assert it in any charge filed with the MCAD bars its consideration. Finally, Stop & Shop argues that its proper response to the glue incident protects it from liability for that event, even if the incident would suffice to warrant relief.
Cuddyer responds by relying on the doctrine of continuing violation; she contends that she experienced a sexually hostile environment over the entire period of her employment, such that each incident must be considered not in isolation, but as part of an overall pattern. The glue incident, according to this theory, brings the entire pattern of harassing conduct within the limitations period, reviving the prior incidents and making them all actionable, no matter how long ago they occurred.[5] She contends further that Stop & Shop’s response to the glue incident was not adequate, and in any event would not affect its liability because of Pearson’s role as a foreman. As to the Sanchez drawing, Cuddyer argues that she was not required to amend her MCAD charge or file a new charge, because the incident was within the scope of the claim on which the MCAD had already found probable cause.
The filing of a timely charge of discrimination with the MCAD is a prerequisite to a suit alleging discrimination under G.L.c. 15IB, §4. Green v. Wyman-Gordon Co., 422 Mass. 551, 554 (1996); Charland v. Muzi Motors, Inc., 417 Mass. 580, 583-84 (1994). Section 5 of Chapter 15 IB requires that such a charge be filed with the agency within six months of the occurrence of the discriminatory act. See School Committee of Brockton v. MCAD, 423 Mass. 7, 10 (1996). This six-month filing rule is in effect a statute of limitations for discrimination claims. Christo v. Edward G. Boyle Ins. Agency, Inc., 402 Mass. 815, 817 (1988).
The six-month limit, however, does not bar filing “where the unlawful conduct complained of is of a continuing nature.” 804 Code Mass. Regs. §1.03(2); see Rock v. MCAD, 384 Mass. 198, 205-08 (1981) (upholding “continuing violation” regulation as permitting MCAD to remedy ongoing discriminatory policies); see Lynn Teachers Union v. MCAD, 406 Mass. 515, 520 (1990) (applying doctrine to longstanding seniority system that gave continuing effect to earlier discriminatory maternity leave policy). Case law has recognized two types of continuing violations: systemic and serial. See Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 220 (1997); Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 221 (1st Cir. 1996). A systemic violation has its roots in a discriminatory policy or practice aimed at a class of employees, affecting such matters as hiring, promotion, training or compensation. Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998); Lawton v. State Mut. Life Assur. Co., 101 F.3d at 222; Jensen v. Frank, 912 F.2d 517, 523 (1st Cir. 1990); see e.g. Lynn Teachers Union v. MCAD, 406 Mass. at 521-23. Serial violations, in contrast, involve “a chain of similar discriminatory acts emanating from the same discriminatory animus.” Provencher v. CVS Pharmacy, 145 F.3d at 14. See also Carter v. Commissioner of Correction, 43 Mass.App.Ct. at 220.
In cases of systemic violation, the violation continues as long as the discriminatory policy or practice itself continues. Thus, a plaintiffs MCAD charge is timely.if it is filed while the policy remains in effect, or within six months thereafter, regardless of whether a discrete act of discrimination transpires during the limitations period. See Lynn Teachers Union v. MCAD, 406 Mass. at 521-23; Lawton v. State Mut. Life Assur. Co., 101 F.3d at 222; Jensen v. Frank, 912 F.2d at 523.
In cases of serial violation, however, a plaintiff relying on the continuing violation doctrine to claim relief for incidents that would otherwise be time-barred faces a more difficult task. Such a plaintiff must show not only that some actionable conduct occurred within the limitations period, but that the timely incident bears a “substantial relationship” to the earlier ones, Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d 396, 401 (1st Cir. 1990), such that the “timely act form[s] part of and expos(es) a pattern.” Provencher v. CVS Pharmacy, 145 F.3d at 14. A plaintiff cannot meet this requirement if he or she *496 “was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place.” Id., citing Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d at 401-02.
This rule follows from the purpose of the continuing violation doctrine with respect to serial violations. That purpose is not to excuse a plaintiff from the consequences of his or her own decision not to bring a claim within the time permitted by law. A claim “arising out of an injury which is ‘continuing’ only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the . . . limitation period.” Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d at 401-02, quoting Roberts v. Gadsden Memorial Hospital, 850 F.2d 1549, 1550 (11th Cir. 1988). Rather, the doctrine serves to “permit the inclusion of acts whose character as discriminatory was not apparent at the time they occurred.” Speer v. Rand McNally, 123 F.3d 658, 663 (7th Cir. 1997). The doctrine recognizes that “[d]iscrimination cases may involve acts that amount to unlawful discrimination upon their repetition or escalation,” Provencher v. CVS Pharmacy, 145 F.3d at 14, but that “may not be diagnosable as . . . discrimination” prior thereto. Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1166 (7th Cir. 1966). See also West v. Philadelphia Elect. Co., 45 F.3d 744, 754 (3d Cir. 1995) (exception to standard filing time serves to accommodate indeterminate situations that cannot be measured in full as they occur). In such situations, the continuing violation doctrine permits a victim of discrimination to bring the claim at the time he or she does or should recognize the nature of the conduct, and then to obtain relief for the entire series of events constituting the discrimination. The doctrine does not, however, obviate the general rule that “a knowing plaintiff has an obligation to file promptly or lose his claim.” Provencher, 145 F.3d at 15.[6] Accord, Riebold v. Eastern Casualty Insurance Co., Inc., 9 Mass. L. Rptr. No. 27, 603-04 (May 3, 1999) (Brassard, J.); Rose v. Baystate Medical Center, Inc., 985 F.Sup. 211, 216 (D.Mass. 1997); Desrosiers v. Great Atlantic & Pacific Tea Co., Inc., 885 F.Sup. 308, 312-13 (D.Mass. 1995); but see Clifton v. Massachusetts Bay Transportation Authority, Suffolk Superior Court No. 95-2686H, 11 Mass. L. Rptr. 316 (Gants, J.) (February 3, 2000) slip op. at 7-10 (expressing doubt that Supreme Judicial Court will adopt federal rule of Provencher and Sabree); Tavares de Almeida v. The Children’s Museum, Suffolk Superior Court Civil Action No. 99-0901H, 11 Mass. L. Rptr. 165 (Gants., J.) (January 11, 2000), slip op. at 9-10 (same).[7]
Here, although Cuddyer seeks to characterize her claim as one of systemic violation, she identifies no general policy or practice of the employer, aimed at the members of a particular class, as the basis of her complaint. Her claim, rather, is of statements and gestures made toward her by certain foremen and co-workers, all reflecting a discriminatory attitude toward her as a woman in the workplace. This is a claim of serial continuing violation. See Provencher, 145 F.3d at 14. To revive events more than six months before her MCAD filing, therefore, Cuddyer must show that she did not and could not reasonably have recognized those events as unlawful until a date within that time period. The undisputed facts establish the contrary. According to her own deposition testimony, as to each incident prior to September 7, 1994, Cuddyer perceived the conduct alleged as sexual harassment either at the time it occurred or soon after, and in each case more than six months before she filed her MCAD charge on March 6, 1995. Indeed, she made contemporaneous complaints to co-workers and management about many of the incidents. As to others, she refrained from complaint despite her own recognition of the discriminatory nature of the conduct. Cuddyer nevertheless failed to exercise her rights under c. 15 IB by alleging those events in a charge with the MCAD filed within six months of their occurrence. Those events are thus time-barred, and Cuddyer cannot recover any relief for them.
The remaining question is whether the two incidents within the limitations period — the glue incident on September 7, 1994, and the Sanchez drawing in September 1997 — are sufficient to support the plaintiffs claim of sexual harassment. For this purpose, it is necessary to address Stop & Shop’s contention that the latter incident must be excluded from consideration because she failed to exhaust her administrative remedies by raising the incident in a charge filed with the MCAD.
In cases involving allegations of retaliation after an MCAD filing, courts have held that no amendment or new filing is necessary, since the MCAD proceeding on the original charge suffices to meet the purposes of the filing requirement with respect to the overall dispute. See Carter v. Commissioner of Correction, 43 Mass.App.Ct. at 218; Smith v. Mitre Corp., 949 F.Sup. 943, 948 (D.Mass. 1997); Baranek v. Kelly, 630 F.Sup. 1107, 1114 (D.Mass. 1986). These cases reason that after the original filing has notified the employer of the potential suit, and the opportunity for conciliation thereby provided has failed to solve the problem, requiring an additional administrative filing would serve only to increase costs and delay final resolution. Smith v. Mitre Corp., 949 F.Sup. at 948. In a case factually analogous to this one, another judge of this Court applied the same reasoning to post-filing incidents of alleged harassment of the same nature as had been charged in the MCAD filing. Riebold v. Eastern Casualty Insurance Co., Inc., 9 Mass. L. Rptr. No. 27, at 603-04. See also Almendral v. New York State Office of Mental Health, 743 F.2d 963, 967 (2d Cir. 1984) (allowing claim of failure to promote occurring after filing of EEOC charge alleging pattern of failure to promote based on race); Brown v. Hartshorne Public School District, 864 F.2d 680, 682 (10th Cir. 1988) *497 (allowing claim of failure to hire occurring after filing of EEOC charge alleging pattern of refusal to hire based on national origin and retaliation).
Here, Cuddyer’s MCAD charge put Stop & Shop on notice that she claimed a sexually hostile environment in the commissary arising from repeated sexual harassment by several employees over a period of time, as well as the reactions of other employees to her complaints of that conduct. Her charge alerted Stop & Shop to the need to investigate the environment among employees in the plant with respect to sexual harassment, and provided an opportunity for conciliation in the MCAD focusing on that aspect of the employer’s environment. Although the charge did not name Henry Sanchez as a perpetrator of harassment, the information provided in the charge would reasonably be expected to stimulate investigation broad enough to reveal Cuddyer’s allegations regarding Sanchez’s earlier conduct toward her. The 1997 drawing incident, as alleged by Cuddyer, is of a similar nature to her other allegations, and in that sense relates to and supports the overall claim of a sexually hostile environment presented in her MCAD filing. Thus, an amendment to Cuddyer’s MCAD charge, or a new charge regarding the drawing incident, would have served none of the statutory purposes, and was not required. The drawing incident therefore is appropriately included in considering whether Cuddyer’s evidence is sufficient to warrant trial of her claim.
General Laws Chapter 151B, §1(18) (1986), defines sexual harassment as:
sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.
In evaluating whether alleged conduct is sufficient to meet this definition, the Court must look at all the circumstances, including the frequency of the conduct complained of, its severity, the presence or absence of any physical contact or intimidation, and the tenor and intensity of any degrading language used. See Melnychenko v. 84 Lumber Company, 424 Mass. 285, 287 (1997); Ramsdell v. Western Mass. Bus Lines, Inc., 415 Mass. 673, 677 (1993); Gnerre v. MCAD, 402 Mass. 502, 508-09 (1988). Although no particular number of incidents is required, the harassment must be sufficiently pervasive to alter the conditions of employment. See Gnerre v. MCAD, 402 Mass. at 507-08; College-Town v. MCAD, 400 Mass. 156, 162 (1987); see also Morgan v. Massachusetts General Hospital, 901 F.2d 186, 192-93 (1st Cir. 1990) (allegations not actionable because would not affect reasonable person’s work performance and not sufficiently pervasive); Mullenix v. Forsyth Dental Infirmary for Children, 965 F.Sup. 120, 152-53 (D.Mass. 1996) (allegations not sufficiently pervasive or severe to be actionable). Each case must be evaluated on its own facts, with the evidence of harassment considered from the perspective of a reasonable person in the plaintiffs position. Gnerre v. MCAD, 402 Mass. at 507. See, e.g., Battenfield v. Harvard University, 1 Mass. L. Rptr. No. 4, 7-8 (October 4, 1993) (Fremont-Smith, J.) (whether conduct was sufficiently pervasive presented factual issue for trial).
Here, Cuddyer’s claim is based on two incidents, three years apart, in each of which a foreman engaged in conduct she perceived as intended to humiliate her by reference to her sexuality. The earlier, now time-barred incidents, even though unavailable as a basis for relief in themselves, warrant consideration in evaluating how a reasonable person in Cuddyer’s position would perceive and react to the conduct alleged on these two occasions; evidence of earlier events, particularly those involving Pearson and Sanchez, would tend to corroborate Cuddyer’s interpretation of their conduct on these two occasions, and to explain the extent of her reactions. See Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d at 400, n.9 (time-barred acts as relevant background evidence); Battenfield v. Harvard University, 1 Mass. L. Rptr. No. 4, at 7 (allegations sufficient to warrant trial when considered in context of prior time-barred incidents between plaintiff and same co-worker). Nevertheless, it is undisputed that neither incident involved any physical contact, any request for sexual favors, any vulgar or demeaning language, or any threat or intimidation. Nor can two incidents three years apart qualify as frequent. Even in the context of the past events, and considered in the light most favorable to Cuddyer, these two incidents simply could not support a finding of harassment so severe or pervasive as to alter the conditions of employment, or to interfere with a reasonable employee’s work performance. The evidence offered is thus insufficient to support a cause of action for sexual harassment within the statutory limitations period, and the defendant is therefore entitled to judgment as a matter of law.[8]
CONCLUSION AND ORDER
For the foregoing reasons, it is hereby ORDERED that Stop & Shop’s motion for summary judgment be ALLOWED.

The plaintiffs statement pursuant to Superior Court Rule 9A(b)(5), rather than directly admitting or disputing the facts set forth in the defendant’s statement, recasts the facts stated by the defendant in somewhat different language, or with different emphasis. This approach leaves to the Court the task of comparing the two versions, along with the evidence cited in each, in an effort to identify the facts that are actually in dispute. The Rule 9A(b)(5) statements have thus been relatively unhelpful to the Court in considering this motion.

The testimony to this effect appears to refer to the present, leaving uncertain whether any significant change has occurred over the period of Cuddyer’s employment.

Goodman's affidavit indicates that he became general manager in 1984, and plant manager in 1994.

References to Leach in the deposition testimony of various witnesses suggest that his employment with the defendant ended some years before the other events in issue in this case, but the evidence does not supply the actual dates of his employment.

Cuddyer also suggests that Stop & Shop is barred from asserting its statute of limitations defense by its failure to do so before the MCAD. For this proposition she cites a regulation of the MCAD requiring that a respondent's answer to a charge “assert all jurisdictional and other defenses which the Respondent wishes to raise." 804 Code Mass. Regs. §1.10(8)(d). The argument would have strength if this action were one for review of an adjudicatory decision of the MCAD pursuant to G.L.c. 30A; in such cases, issues not raised before the agency are waived, and cannot be presented for the first time on judicial review. See Foxboro Harness, Inc. v. State Racing Commission, 42 Mass.App.Ct. 82, 85 (1997). Here, however, the plaintiff has chosen to present her claims to this Court for adjudication, rather than wait for final resolution in the MCAD. The Court thus addresses the claims directly, rather than on review of agency action, and the defendant is entitled to respond to them directly, raising any affirmative defenses available to it.

In this respect, the continuing violation doctrine may be understood not as an exception to the statute of limitations, but as an application of the discovery rule: the limitations period applies to serial continuing violations without exception, but begins to run only when the cause of action accrues, which occurs when the plaintiff does or reasonably should discover it.

These two Superior Court opinions express concern that the federal rule will force plaintiffs to choose litigation prematurely for fear of losing claims, rather than give the employer time to solve the problem. The concern is well warranted, but is inherent in the nature of a statute of limitations, not specific to its particular application to serial violations of which a plaintiff has become aware. A limitations period longer than six months might address this concern, but the task of balancing the policies served by the statute of limitations with those served by allowing time for informal resolution is for the legislature.

In fight of this conclusion, the Court has no occasion to address the parties’ contentions as to the supervisory status of foremen and the sufficiency of Stop & Shop’s response to Cuddyer's complaint of the glue incident.