Kern, J.
This action arises out of a discrimination claim filed by plaintiff, Mary McKearney (“McKearney”), against her former employer, Think New Ideas, Inc. ("Think Inc.”), Answer Think Consulting Group, Inc. (“Answer Think”),[2] and her former supervisor Daniel McCartney (“McCartney”). In her complaint, McKearney alleges constructive discharge (Count I), gender discrimination in violation of G.L.c. 151B, §4 (Count II) and pregnancy discrimination in violation of G.L.c. 151B, §4(11A) and G.L.c. 149, §105D (Count III). All defendants move for summary judgment. For the reasons set forth below, defendants’ Motion for Summary Judgment is ALLOWED.

BACKGROUND

Where facts in the voluminous summary judgment record are in conflict or subject to contrary inferences, the court adopts the version of facts most favorable to the non-moving party. The most relevant facts are summarized below.
In June of 1994, Boston Business Graphics (“BBG”) hired McKearney as an account executive.[3] In this capacity, McKearney was responsible for selling BBG’s digital output, presentation and multimedia servh'-'s. The digital output services offered by BBG incluí ,:d the making of color copies, slides and overheads. The presentation services included PowerPoint presentations, slide creation and other electronic productions. The multimedia services encompassed simple web site development, and CD-ROM presentations. At the time BBG hired McKearney, the company was owned and operated by partners Joseph Nicholson and McCartney. In 1993, BBG hired Cari Sloan (“Sloan”) as an account executive and then subsequently promoted her to Director of Sales and then to Vice President.[4] BBG also hired Catherine Rodgers (“Rodgers”) to direct the Human Resources Department for their Boston office.
Some years later, prior to November of 1997, BBG promoted McKearney to Sales Manager, a position that required her to sell BBG’s services. In this capacity, she managed a small staff of approximately seven people, including Jill Brown and Raelene Roberge. BBG paid McKearney a base salary of $35,000 plus 5% commission on direct sales. During this time, BBG’s business focus began to shift to Internet and web-based opportunities, although it still maintained its traditional digital output, presentation and multimedia services.
On or about November 7, 1997, Think Inc. acquired BBG pursuant to the terms of a purchase and sale agreement. This agreement allowed certain director-level employees of BBG who owned stock to exchange their BBG stock for Think Inc. stock.[5] After the acquisition, a decision was made to separate BBG’s web-based activity from its digital output, presentation and multimedia business lines. This decision was made by Sloan, McCartney and officers of Think Inc. Thereafter, McKearney met with McCartney to discuss the sales team. The meeting was memorialized in a memo Mc-Kearney dated December 17, 1997. In this memo, her statements included the following:
As you know I am a real mixed bag, I like it all. I particularly like the large production and even projects, multimedia and CD-ROM projects and the management and training aspect of my job. I also have developed strong relationships with my clients over the years and they rely on me to consult them on where they should be as far as new media. Web is not where I want to concentrate mainly because if that is what a sales person wants to do they need to do only that. However, it is a natural progression for many of my clients to move in that direction and I don’t want to miss out on any opportunities there. Some of my clients have been in discussion with me *58 for over a year regarding the web and who knows when the timing will be right. Would like to be a director.
Thereafter, Sloan relinquished her supervisory responsibilities over McKearney and became directly involved in web-related business. McKearney then became the Sales Manager of Presentation and Digital Output Services and retained direct responsibility over the account coordinators and managers. She received a salary of $35,000 and a new commission structure.[6] McKearney performed in this position from January 5, 1998 until her maternity leave on April 28, 1998. Think Inc. extended McKearney's maternity leave to July 21, 1998.
During McKearney’s maternity leave, Think Inc. eliminated the digital output group, effective June 30, 1998, because of declining profits. As a result, ten employees were laid off. Eight of those employees had reported to the Manager of Digital Services, Michael Fruhbies.[7] The other two employees laid off had reported to McKearney. Neither McKearney nor Michael Fruhbies were consulted about the changes affecting the department, and instead were given notice the day it was announced to the staff. McKearney was not laid off, but was given a new title of “New Business Development” which allowed her to continue to sell the presentation and multimedia services. Two of her subordinates, Wendy Thompson and Anne Healy were reassigned to Mary Forsythe Taber, the Director of Production Services, although these employees continued to perform essentially the same tasks as they did before under McKearney’s supervision.
While still on maternity leave in June of 1998, Think Inc. hired a new Director of Client Services, Chia Chen. This position was superior to McKearney’s. Chia Chen was given McKearney’s office with a window to conduct client meetings due to the limited conference space. McKearney was relocated to a windowless office across the hall. Also at this time, McKearney was informed that she would not be receiving commissions on a Raytheon account. The commissions were given to another individual who had worked directly on the account while McKearney was on maternity leave.
On July 21, 1998, McKearney returned from her maternity leave and was told of her new position in New Business Development. She was given a revised compensation plan to reflect Think Inc.’s fiscal year for 1999, which began on July 1, 1998.[8] In McKearney’s new position, her base salary remained the same. She continued to receive a 3% commission on direct sales and 1% referral fee on website business. McKearney was also informed that she would not be able to work from home despite her prior agreement with Sloan and McCartney to do so.
Subsequently, in November of 1998, Think Inc. moved to a new Boston location. McKearney learned that she would be provided with a cubicle and not office space there. On November 13, 1998, McKearney resigned from her job to begin working for Innovision.
McKearney filed her discrimination claim with the Massachusetts Commission Against Discrimination (“MCAD”) on February 22, 1999.

DISCUSSION

Summary judgment shall be granted when there are no genuine issues of material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Corrections, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Id. at 17. In ruling on the motion, the court should consider the evidence with an indulgence in the opposing party’s favor. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). However, vague and general allegations of expected proof are not enough to defeat a summary judgment motion. Cherella v. Phoenix Technologies. Ltd., 32 Mass.App.Ct. 919, 920 (1992).
A. Statute of Limitations
The defendants move for summary judgment on Counts II and III on the grounds that the incidents which form the basis for McKearney’s claims of gender and pregnancy discrimination are barred by the applicable statute of limitations. G.L.c. 15IB, §5 provides that “any complaint filed pursuant to this section must be so filed within six months after the alleged act of discrimination.”[9] McKearney responds by relying on the continuing violation doctrine. She argues that Think Inc. and her supervisor McCartney, took a series of discriminatory actions against her from January through November of 1998 resulting in the loss of compensation, responsibility and prestige within the company. Further, McKearney argues that the full impact of the individual actions taken against her was not clear at the time they happened, and ’that each incident should not be viewed separately but rather as part of an overall pattern of discrimination. Following this reasoning, the November 1998 incident involving a decision not to give her an office revives the past incidents occurring from January to July of 1998 for purposes of the statute of limitations.
Chapter 15 IB provides “two largely independent avenues for redress of violations of the antidiscrimination laws of the commonwealth, one through the MCAD . . . and the other in the courts.” Charland v. Muzi Motors, Inc. 417 Mass. 580, 583 (1994), quoting Christo v. Edward G. Boyle Ins. Agency, Inc., 402 Mass. 815, 817 (1988). “Resort to the courts is not available for a complaint of discrimination within the jurisdic *59 tion of the MCAD unless the person claiming to have been the object of unlawful discrimination first makes a timely complaint to that agency.” Cherella v. Phoenix Technologies Ltd., 32 Mass.App.Ct. 919, 919 (1992) (citations omitted). See also Green v. Wyman-Gordon Co., 422 Mass. 551, 554 (1996): Treadwell v. John Hancock Mut. Life Ins. Co., 666 F.Sup. 278, 282 (D.Mass. 1987).
An exception lies where “the unlawful conduct complained of is of a continuing nature.” 804 Code Mass. Regs. 1.03(2); Lynn Teachers Union, Local 1037 v. MCAD 406 Mass. 515, 520 (1990). Two types of continuing violations exist: systemic and serial. See Carter, supra, at 220. A systemic violation stems from a discriminatory practice or policy aimed at a class of employees which affects hiring, promotion, compensation or training. Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1998). In contrast, serial violations involve “a chain of similar discriminatory acts emanating from the same discriminatory animus.” Id. at 14.[10] “Although the limitations clock generally starts with the commission of a discriminatory act, a true ‘continuing violation’ rewinds the clock for each discriminatory episode along the way.” Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989).
Where a plaintiff is relying on the continuing violation theory to revive earlier incidents that would otherwise be time barred, the plaintiff must demonstrate not only some actionable conduct occurring within the limitations period, but that the timely incident bears a “substantial relationship” to the earlier ones. See Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d 396, 401 (1st Cir. 1990). In assessing whether there is a substantial relationship, the court looks to one of the most important factors: the degree of permanence. “Permanence is basically an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act. What matters is whether, when and to what extent the plaintiff was on inquiry notice.” Desrosiers v. The Great Atlantic and Pacific Tea Company, Inc., 885 F.Sup. 308, 312 (D.Mass. 1995), citing Sabree, supra, at 402. In effect, once a claimant becomes aware that she is the target of harassment, she has a duty to assert her rights under the law. See Rose v. Baystate Medical Center, Inc., 985 F.Sup. 211, 216 (D.Mass. 1997). Moreover, “a knowing plaintiff has an obligation to file promptly or lose [her] claim.” Sabree, supra, at 402; See also Provencher, supra, at 15; Cuddyer v. Stop & Shop Supermarket Co., 2000 WL 343783, at *8 (Mass. Super. March 15, 2000) (11 Mass. L. Rptr. 495).
In Sabree, the court rejected the plaintiffs continuing violation claim because the plaintiff had admitted that “he believed, at every turn, that he was being discriminated against.” Sabree, supra, at 402. The court reasoned that a plaintiff who believes he is being discriminated against but who knowingly fails to seek relief has exactly the type of claim that it barred by the limitations period. Moreover, these types of claims are distinguishable from those of plaintiffs who are unable to appreciate that they are being discriminated against “until [they] have lived through a series of acts” and therefore able to perceive an overall discriminatory pattern. Id.
Similar to the plaintiff in Sabree, McKearney cannot prevail under the continuing violation theory. McKearney acknowledged that as early as June of 1998, she believed she was being discriminated against after her office was given to a newly hired employee. At her deposition she testified in pertinent part:
Q: How did you find out about the fact that your office was being give to Mr. Chen?
A: Cathy Rogers called me and told me.
Q: What did she say to you?
A: Just that my office was being taken. And it was at that time I felt I was being discriminated against.
Q: Did you tell her why?
A: I did.
Q: What did you tell her?
A: I said, “Is this because I’m pregnant and they no longer want me to work there, that they’re trying to force me out?” And she told me she was going to talk to Dan.
(Deposition Transcript Vol. I, pp. 80-81) (emphasis supplied).
In order for McKearney to revive the incidents occurring more than six months before her MCAD filing on February 22 of 1999, she must show that she could not reasonably have recognized those incidents as unlawful until a date within that time period. The plaintiffs deposition testimony, however, reflects a clear awareness that McKearney was on notice of conduct that could trigger her rights under the law. Further, McKearney admits in her affidavit that on two occasions she had stated to the Human Resources Manager that she felt she was being discriminated against. As a knowing plaintiff, McKearney had an obligation to file promptly or lose her claim. Sabree, supra at 402. McKearney, however, waited until February of 1999 to file her claim and therefore the incidents occurring from January through July of 1998 are time-barred, and McKearney cannot recover any relief for them.
B. The Sufficiency of McKearney's November 1998 Claim
The remaining question is whether the incident within the limitations period — the decision to assign a cubicle rather than an office to McKearney — is sufficient standing alone to support a claim for discrimination for Counts II and III. To survive summary judgment in an employment discrimination case, the plaintiff carries the initial burden of establishing a prima facie case of discrimination. For a prima facie case of gender discrimination, plaintiff must show: (1) *60 she is a female, (2) she performed her job at an acceptable level, (3) she was terminated or subject to an adverse action, (4) she was treated differently than similarly situated male employees. Zhang v. Massachusetts Institutes of Technology, 46 Mass.App.Ct. 597, 602 (1999); Brunner v. Stone & Webster Eng’g Corp., 413 Mass. 698, 700 (1992). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced is the real reason. Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) (citations omitted). The burden then shifts back to the plaintiff to demonstrate that the employer’s reasons are not genuine but a pretext for discrimination. Id.
McKearney claims that the November 1998 decision not to give her an office in Think Inc.’s new building in Boston constituted discrimination. Assuming that McKearney has established a prima case of discrimination, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. Matthews, supra. Think Inc. has presented sufficient evidence to establish that the decision to give McKearney a cubicle was justified by business considerations. In deposition testimony, Sloan and Rogers both stated that only directors and employees above director level were given office space.[11] It was uncontradicted that there were not as many offices in the new location as in the old. Further, McKearney acknowledged, in her deposition, that no other sales employees were given offices, and that she was not the only employee who did not receive an office.
Once Think Inc. articulates a nondiscriminatory reason for the adverse employment decision, the burden shifts back to McKearney to convince the court that defendants’ reasons for its employment decision were a pretext. Mathews, supra. McKearney has not presented any evidence to demonstrate that Think Inc.’s stated reasons for not giving her an office in their new location were a pretext. Therefore, the November 1998 incident does not survive summary judgment.
C. Constructive Discharge
Finally, McKearney’s complaint alleges that she was constructively discharged. A [constructive discharge occurs when the employer’s conduct effectively forces an employee to resign." GTE Products Corp. v. Stewart, 421 Mass. 22, 33-34 (1995), quoting Turner v. Anheurser-Busch Inc., 7 Cal.4th 1238, 1244-45 (1994). To establish a claim for constructive discharge, McKearney must prove that “the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee’s shoes would have felt compelled to resign.” Id., quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 199 (1st Cir. 1977). “This is an evaluative determination made by applying an objective standard, not a state-of-mind standard.” Tavares de Almeida v. Children’s Museum, 28 F.Sup.2d 682, 686 (D.Mass. 1998); see also Turner, supra, at 1248; Vega v. Kodak Caribean, Ltd., 3 F.3d 476, 481 (1st Cir. 1993).
“In order to amount to a constructive discharge, adverse working conditions must be unusually ‘aggravated’ or amount to a 'continuous pattern’ before the situation will be deemed intolerable.” Turner, supra, at 1247. Usually, a single, isolated act of an employer will not form the basis for a constructive discharge claim. GTE Products Corp., supra, at 34.
McKearney claims that she was compelled to resign due to a pattern of conduct that her employer engaged in over an eleven-month period. This conduct, McKearney contends, resulted in reduced compensation, title and workspace. Viewing the evidence in the light most favorable to McKearney, and drawing all reasonable inferences in her favor, this court nonetheless concludes that the conditions under which McKearney alleges she was forced to work were not so intolerable that a reasonable person would have felt compelled to resign. McKearney’s evidence is insufficient to warrant submission to a jury, and as a matter of law, a jury could not find that she was constructively discharged.
Although a number of changes affecting McKearney occurred over a period of months, these changes related to an overall restructuring within the company, and Think Inc.’s decision to eliminate the digital output group. Specifically, McKearney claims that while on maternity leave, her assistant was fired and two account coordinators on her staff were reassigned. Further, McKearney claims that upon return from maternity leave, she was given a new title and compensation plan, and denied commissions on existing accounts. Although McKearney claims she experienced a loss of prestige within the company, she continued to retain a sales position along with her former base salary.[12] McKearney was not relegated to a position with no duties or responsibilities. In fact, Think Inc. wanted McKearney to continue to sell the presentation and multimedia services for the company. Her title in “New Business Development” and newly restructured compensation plan were commensurate with an overall shift in the company’s business focus.[13] Although McKearney may not have desired to assume these new duties, it cannot be said that the change in her position constituted intolerable working conditions. See GTE Products Corp., supra, at 35; Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2nd Cir. 1993) (mere dissatisfaction with assignments and compensation insufficient to establish triable question of fact on issue of constructive discharge).
In addition, McKearney asserts that changes in her workspace[14] and a decision in July of 1998 not to allow her to work from home, resulted in her resignation. Mere subjective dissatisfaction, however, cannot form the basis for a constructive discharge claim. See Tavares de Almeida, supra, at 686. This is not a case *61 where there was a demotion, humiliating and unjustified criticism, or a great increase or decrease in workload or hours, which have previously formed the basis of constructive discharge actions. See Contardo v. Merrill Lynch, Pierce, Penner & Smith, Inc., 753 F.Sup. 406, 411 (D.Mass. 1990); Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987) (“[p]art of an employee’s obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast”).
Under all the facts that existed in this case, no reasonable person in McKearney’s position would have felt compelled to resign. Accordingly, because no triable issue exists as to the constructive discharge claim, summary judgment is appropriate on Count I.

ORDER

For the foregoing reasons, defendants’ Motion for Summary Judgment is ALLOWED.

 Answer Think subsequently acquired Think Inc. after McKearney terminated her employment.

 Sometime after McKearney was hired, BBG changed its name to BBG New Media.

 McKearney maintains that Sloan’s success was attributed in part to the fact that she was “No. 1" on McCartney’s ”f — k list.”

 The merger agreement also contained an “earn-out” provision for McCartney, Sloan, Joe Nicholson and other director-level employees. This provision allowed those individuals to receive additional stock of Think Inc. so long as the former BBG office achieved certain established revenue goals during the period November 7, 1998 through October 31, 1999. McKearney was not eligible to receive this stock because at the time of the merger she was not a director.

 McKearney's commission structure included the following: 3% commission for direct sales of digital output, presentation and multimedia; 1% referral fee for internet business referred to Sloan for closure; 1% commission on “house” accounts. The 1% referral fee for internet business applied to other account executives as well.

 Michael Fruhbies was not laid off, but was retained as Traffic Manager. He did not, however, continue to supervise employees.

 Commission on an already existing account was reduced to reflect this change.

 McKearney is suing pursuant to G.L.c. 151B, §4 and G.L.c. 149, §105D. G.L.c. 151B, §4(11 A) incorporates c. 149, §105D and therefore an action under c. 149 is subject to the same six-month statute of limitations. McKearney’s claims under c. 149 are barred in any case because she was on maternity leave for over eight weeks. A female employee is protected under the statute if their maternity leave is for a period “not exceeding eight weeks.” Therefore, the protections of c. 149 do not apply here. Plaintiff asks the court to recognize, as a matter of public policy, that employers can evade the statute by giving employees over eight weeks of maternity leave. This issue is for the legislature to address and not for the courts.

 McKearney has not alleged facts constituting a systemic violation. Therefore, the court’s analysis is focused on her allegations under a serial violation theory.

 An exception was made for Rogers because she was Director of Human Resources.

 While Think Inc. laid off a number of employees as a result of the elimination of the digital output department, McKearney was retained.

 Commission on an already existing account was also restructured to reflect Think Inc.’s fiscal year.

 Think Inc.’s decision in June of 1998 to give McKearney’s office to a newly hired employee, Chia Chen, was justified by business considerations. Think Inc. hired Chia Chen as the Director of Client Services and McKearney’s office with a window provided a more suitable environment for client meetings. Further, Think Inc.’s decision in November of 1998 to give McKearney a cubicle in their new Boston location was also justified by business considerations. Due to the lack of space, offices were only given to directors and higher level executives, with the exception of the human resources director.